**PHILCO FINANCE CORPORATION and Jacob C. Pongetti, Trustee in Bankruptcy, Plaintiffs,**

v.

**John PEARSON et al., Defendants.**

**No. EC 7035.**

United States District Court, N. D. Mississippi, E. D.

Dec. 10, 1971.

M. Curtiss McKee, Thomas G. Lilly, Jackson, Miss. and Jacob C. Pongetti, Columbus, Miss., for plaintiffs.

William S. Turner, Aberdeen, Miss., Omar Craig, Oxford, Miss. and Clarence R. Scales, Jackson, Miss. (for John Pearson, Rosemary Pearson and George J. Heard), James C. Mayo, Louisville, Miss. (for Triplett and Classic Cleaners).

## MEMORANDUM OPINION

KEADY, Chief Judge.

This case is before the court on the complaint of Philco Finance Corporation (Philco), a Delaware corporation, against John Pearson and wife, Rosemary Pearson, Mississippi citizens, George J. Heard, a Tennessee citizen, and other Mississippi defendants,[1] to set aside as a conveyance in fraud of creditors the transfer by Pearson to Heard of 25,000 shares of stock in Classic Cleaners, Inc. (Classic), and for certain incidental relief. Jacob C. Pongetti, Trustee of Pearson's estate in bankruptcy, No. EBK 7076–K, on the docket of this court, has been allowed to intervene as a party plaintiff.

The Pearsons filed a joint answer of general denial as to the allegedly fraudulent conveyance. By separate answer, Heard averred affirmatively that on November 1, 1966, he purchased the stock from Pearson, paying a valuable consideration therefor, and that he was a bona fide purchaser of value, without notice of claims of Philco and other Pearson creditors.

Prior to trial, the parties entered into a lengthy stipulation of facts. The court conducted an evidentiary hearing on disputed matters, and after submission of briefs by counsel, the case is now ripe for decision. This memorandum will suffice for findings of fact and conclusions of law required by Rule 52 of F.R.Civ.P.

On July 28, 1965, Philco sued Pearson in this federal court on a promissory note of $36,667.80 executed by Pearson on July 17, 1963 payable in installments beginning April 1, 1964. The action was for a deficiency judgment after sale of collateral. Although Pearson resisted the demand, this court on September 30, 1968, rendered judgment against him for $39,919.52, which sum was later reduced to $37,919.52. A writ of execution on the judgment issued May 12, 1970, and was returned unsatisfied. No part of Philco's judgment has been paid.

On June 23, 1970, while the Philco litigation was pending, Pearson filed in this federal district court a voluntary petition in bankruptcy, listing assets of $2,300 and debts of $55,629.52. In his bankruptcy proceeding petitioner claimed entitlement of $300 monthly as salary from Classic. Philco was listed as a creditor but Pearson did not disclose the Classic stock as an asset. On November 12, 1970, Pearson was discharged as a bankrupt without objection; however, on November 9, 1971, Philco filed with the bankruptcy court a petition, which is pending, to revoke the discharge under § 15 of the Bankruptcy Act.[2]

---

1. The other defendants were Clarence R. Scales, who acted as Pearson's attorney, Classic Cleaners, Inc., a Mississippi corporation domiciled at Louisville, Mississippi, and John T. Triplett who was president, manager and other stockholder of Classic Cleaners. At conclusion of plaintiffs' evidence, Scales and Triplett were dismissed from the case by the court in a bench ruling.

2. 11 U.S.C. § 33. Discharges, when revoked
   The court may, upon the application of parties in interest who have not been guilty of undue laches, filed at any time

In 1963, when Pearson originally contracted the Philco indebtedness he was engaged in the business of operating coin-operated laundry and dry cleaning establishments at different locations in several Mississippi towns, and he incurred that indebtedness in connection with the purchase and financing of such equipment. In the latter part of 1963 Pearson and John T. Triplett jointly purchased a dry cleaning and laundry business at Louisville, Mississippi, known as Classic Cleaners, at a purchase price of $25,000. Pearson and Triplett immediately incorporated the business, authorizing the issuance of 50,000 shares of common stock without par value. 25,000 shares were issued to Pearson, for which he paid $10,000 cash which was used to make the down payment on the purchase price. The other 25,000 shares were issued to Triplett, for which he agreed to pay $10,000 on the purchase price payable in monthly installments of $300. The $5,000 balance on the purchase price was to be paid to the seller by Classic out of its corporate earnings. Triplett was elected president and director and made manager of the business by a 10-year contract paying him $300 monthly for his services. At the same time Pearson was elected vice president, secretary and director but actually performed no services for the corporation. Triplett nevertheless contracted with Pearson for the latter to be paid $300 per month for 10 years for salary as "Public Relations Director". This agreement provided that Pearson would receive his money out of the first monies earned by the business after taxes, and before paying the manager's salary, until Pearson was reimbursed the $10,000 used as down payment for the business, after which Pearson and Triplet would draw equal sums of money from the business.[3] The corporation paid Pearson $300 monthly under this agreement from January 1964 to May 1970, except that he received only $150 in March 1970. Like amounts were paid to Triplett during that time. Classic made no further distributions to its stockholders, nor formally declared dividends out of earnings.

In October 1966 the Pearsons sold their residence at Louisville for a cash consideration of about $9,000 as indicated by revenue stamps on the conveyance. That same month Pearson and Triplett executed a 6-year lease with the landlord owning the building in which Classic Cleaners was located. Apart from the Classic stock, Pearson owned small equity in another residence and real estate at Philadelphia, Mississippi. He and his wife, who was gainfully employed, enjoyed only modest income, as disclosed by their tax returns. No longer a laundry operator himself, Pearson's main business occupation was selling and servicing coin-operated laundry and dry cleaning equipment for customers. In that connection, he had established a business relation with Heard, a resident of Memphis who had credit rating with several finance companies, whereby Heard endorsed commercial paper on certain equipment sales, in consideration for which Pearson paid him one-half of his sales commissions. Heard was engaged in acting as distributor of such coin-operated machinery for several manufacturers.

within one year after a discharge shall have been granted, revoke it if it shall be made to appear that it was obtained through the fraud of the bankrupt, that the knowledge of the fraud has come to the petitioners since the granting of the discharge and that the actual facts did not warrant the discharge.

3. This agreement provided: "It is further agreed by and between the parties hereto that if and when each of the parties hereto have received from the said business as salary up to an amount equal to $10,000.00 as above stated, then and in that event, each party will draw from said business an equal amount as salary regardless of their position and shall share and share alike in all income derived from the operation of said business, and if one party is to receive a salary from said business, then the other party shall receive a salary in a like amount, in whatever equal amounts the company is able to pay."

On November 1, 1966, Pearson and Heard, pursuant to telephone calls initiated by Pearson, met in an attorney's office in Memphis and executed a contract for the sale by Pearson of his stock and all other interest in Classic to Heard for $10,000. Present at this meeting were Clarence R. Scales, of Jackson, Mississippi, who was Pearson's attorney, and Henry M. Beaty, Jr., of Memphis, an attorney recommended by Scales to represent Heard. Heard had had no prior contract with Mr. Beaty. By this agreement Pearson resigned as vice president, secretary and director of Classic but retained an option in favor of his wife Rosemary to repurchase the stock for $10,000 at any time within 12 months. Pearson endorsed and delivered his stock certificate to Heard. Pearson and Heard then departed the attorney's office and went to Heard's bank to conduct the unique money negotiations shown by uncontradicted evidence as follows: Heard drew a check against a Memphis bank for $10,000 on his business known as George Heard Sales Company, Inc., and delivered it to Pearson. On that date Heard's bank balance was $13,671.44. Pearson immediately endorsed the check and handed it back to Heard. Next, Heard presented the check to the bank for cashing. Within minutes thereafter Heard redelivered the $10,000 in cash to Pearson, whereupon Pearson immediately purchased a cashier's check for $10,000 payable to Heard. Heard redeposited the cashier's check in his company's account. Not one but several tellers at the same bank handled these items for Heard and Pearson. Also on the same date, Heard paid a $10,000 bank loan from the account and issued a check to a third party for $190, leaving a November 1, 1966, closing balance of $3,481.44. Otherwise stated, the actual withdrawals consisted of a check to the bank for paying the $10,000 loan and the incidental check of $190. The check, cash, and cashier's check passing between Heard and Pearson were a "wash" transaction as Heard had insufficient funds in the account to cover an outstanding check of $10,000.

The following day, November 2, 1966, Triplett met with Pearson, Heard and Scales at Oxford, Mississippi. Triplett, who was desirous of buying Pearson's stock, was informed of the transfer to Heard, and Pearson told Triplett that he wouldn't consider selling him the stock because he knew Triplett would not agree to a resale, as Heard had done. At this meeting, Rosemary Pearson was elected secretary, and a new stock certificate was delivered to Heard evidencing his ownership of the Pearson shares. Heard was not elected an officer or director.

At no time prior to the transfer did Heard make inquiry into the financial affairs of Classic or request an examination of the books and records. The corporation, however, had a net worth of approximately $35,000. Through the Memphis attorney Heard informed Triplett that Pearson would continue to draw the $300 monthly from Classic "as a manager of Mr. Heard, until June, 1967, unless terminated sooner." This same letter also advised Triplett that an audit of the company's business was being arranged but this was never followed up. On December 30, 1966, Heard wrote Triplett directing that he pay the $300 monthly to Rosemary Pearson. Triplett requested that Pearson execute a rescission of his outstanding contract and a new agreement be made in order to protect Classic, but this was never done. Hence, Triplett thereafter made the monthly checks jointly to the Pearsons and George Heard. Heard did not receive any portion of these funds or keep record of the checks delivered to the Pearsons, who endorsed thereon their names as well as Heard's name, cashed the checks and used the proceeds for their own purposes. This arrangement continued until June 1970 when Classic stopped payment upon the filing of the present suit. The Pearsons at no time included on their federal tax returns the income received from Classic, saying it was their understanding that

no tax was due on the first $10,000 received since it was "return of capital", and later on they inadvertently overlooked reporting it as wages or dividends paid by Classic.

Heard, who was president and sole stockholder of George Heard Sales Company, Inc., kept detailed books and records on his business operations yet made no entry recording the Classic stock as an asset or investment acquired either by his corporation or himself individually. Nor do those records disclose a sale or transfer of machinery, equipment or other thing of value from Heard to Pearson as payment for the Classic stock. After the transfer date, Heard submitted financial statements to his Memphis banks for loan purposes, but never listed the disputed stock as an asset. For several years both prior to November 1, 1966, and since that date, Heard endorsed security instruments covering the sale and purchase of laundry equipment with recourse against himself in order to assist Pearson in his sales. Under this arrangement about eight such deals were handled for Pearson from 1966 through 1970, for which Heard's share of the profits amounted to between $8,000 and $10,000.

After November 1, 1966, Pearson made a small bank loan on financial statements previously prepared which listed Classic stock as an asset, Pearson claiming that the item was left in through inadvertence since he was not required to submit an updated statement. Since the transfer, Rosemary Pearson has performed no services for Classic other than acting occasionally in the capacity of secretary, and, of course, no services were rendered to Classic by either Pearson or Heard. From January 20, 1967, to May 11, 1970, a total of $12,150 was paid by Classic on checks jointly payable to the Pearsons and Heard.

On May 6, 1970, Attorney Clarence Scales purportedly acting on behalf of Heard, requested Classic to furnish complete financial statements of the corporation's operation for the preceding two years. This was Classic's first communication or contact with Heard in more than three years. This information had apparently been requested of Scales by a letter dated April 23, 1970, bearing Heard's signature. When Classic furnished the requested financial data, Heard was not "heard" from again. However, on December 31, 1970, another letter purportedly signed by Heard but actually sent by Pearson was received by Triplett threatening him with suit for mismanagement of Classic and hinting at placing the corporation in receivership. This letter, which the court finds was originated by Pearson despite his denial of authorship, also contested Classic's right to withhold the $300 monthly payments notwithstanding the pendency of federal court litigation, and it concluded with a most revealing postscript: "*I* also plan to rebuy *my* stock if necessary." Thus, Pearson not only unwittingly divulged his authorship by the use of the first person and by expressing bitterness toward Triplett for failing to send the monthly checks, but also he overlooked the small matter that if the Heard contract meant what it said, the option to repurchase the stock in the name of Rosemary Pearson had expired more than three years before, or by November 2, 1967.

A key factual issue relates to the proper characterization of the transfer from Pearson to Heard. Each undertook to give an explanation of their dealing, but was vague, evasive and contradictory. Without doubt, Pearson's declarations and acts at all pertinent times affirmed his belief that he was the real owner of the stock, despite the transfer. Heard's position shifted somewhat each time he stated it, as disclosed by his answer, discovery deposition and in-court testimony. His original postulate, as pleaded in his answer, was that he purchased the stock for a consideration of $10,000 cash and $4,000 worth of laundry and dry cleaning equipment. Yet, both in deposition and at trial he was utterly unable to account for the laundry equipment, either what it consisted of, where it was located or what it was worth; this ele-

ment of the alleged consideration was unabashedly abandoned. In his deposition Heard first testified that he wanted the stock as security to protect himself against financial losses that he might suffer by reason of his endorsements for equipment time sales made by Pearson, and later his testimony changed to that of purchasing the stock as an investment as set out in the margin below.[4] At other portions of his deposition and at trial Heard testified that his deal with Pearson was a "two-step transaction", the first step being his purchase of the stock for $10,000 as an investment, and the second step being Pearson's purchase from him of a "line of credit" for $10,000 cash. Heard thus explained how he ended up with both the stock and the money. Heard and Pearson, however, offered no evidence as to the terms and conditions of the so-called "line of credit" so purchased, as for how long it was to exist, to whom it was applicable, for what type of credit it could be employed, who was extending the credit, to whom it was extended, or any essential term. The court is compelled to reject these explanations as utterly incredible and unworthy of belief, for we view the transaction simply as a cleverly contrived effort to have the stock transfer supported by the fictitious semblance of a valuable consideration. The court finds that in all material respects the business relationship between Heard and Pearson was the same before as it was after the date of stock transfer, and Heard held the stock merely as gratuitous transferee.

The defendants' threshold contention is that plaintiffs are barred from bringing this action because of Pearson's discharge in bankruptcy. The well-settled law is to the contrary, namely: that the discharge of a bankrupt in a bankruptcy proceeding does not preclude either the trustee or a lien creditor from instituting or continuing a suit or proceeding to set aside a transfer or con-

4. Extracts from Heard's discovery deposition are:

In response to a question concerning his business relationships with John Pearson, Heard answered on his deposition as follows:

"Mr. Pearson was in the coin operating—owns stores and he also sold equipment, and Mr. Pearson and I had worked together, and Mr. Pearson was wanting—couldn't finance his papers and I agreed to finance his paper for consideration. The consideration was to secure stock of the Classic Cleaners, I thought I was doing it legally and I still think I am." (p. 5)

\* \* \* \* \*

"Q. Mr. Heard, are you telling me that this stock transaction, which is the subject of this suit, was a security arrangement between you and Mr. Pearson?

A. I thought after—I didn't—I knew the arrangement that he was to draw I think around $300.00 a month but I didn't want—to me, this was a business deal, and I thought after ten years—because I knew I was familiar with Classic Cleaners, it is as good equipment as you can find in a cleaners and at that time I thought as good a management and to me, it was a good business transaction, and I gave Mr. Pearson authority to draw the $300.00 to look after it to see that it was run as it should be run, and he could either—and when that was paid to him, I gave the rights —mutual agreement for he or his wife to sign the checks that was made for me for the $300.00 a month or whatever that figure was." (p. 6)

\* \* \* \* \*

"Q. All right, Mr. Heard, I want to be fair with you. The reason—you tell me if this is wrong—the reason you took this stock was to protect your self from liabilities on account of your handling of this paper, is that true?

A. Not particularly. I just thought it was a good business deal. I thought ten years time, whatever that Classic stock was worth, would compensate any loss I had.

Q. So, he posted this stock with you to guarantee you for any contingent liability that you might suffer, isn't that true?

A. I don't know whether you call it a guarantee or not.

Q. Well, it stood there as security against any possible loss that you might suffer.

A. Well, if it was worth anything at the time—at the end of the ten years, it would have been. I thought it was going to be because it's a good cleaner. At that time, I thought it was under good management." (pp. 8, 9)

veyance by the bankrupt as one in fraud of his creditors. 9 Am.Jur.2d, Bankruptcy, § 1190, p. 884; Collier on Bankruptcy (14th Ed.) ¶ 70.90, pp. 1028–1035. Ann. 109 ALR 427. The issues involved in the two proceedings—a hearing on the discharge of a bankrupt and a suit to set aside a fraudulent conveyance by the bankrupt—are not identical, and even though it may be decided in a proceeding for discharge that the very transfer in question was not made with an intent to hinder, delay or defraud creditors the granting of the discharge is not res judicata in an action to set aside the transfer. Thus, Pearson's discharge, even though it may be deemed final and irrevocable, does not operate as a bar to the present action.

Plaintiffs' action to invalidate the stock transfer as a fraudulent conveyance is bottomed upon statutory and case law of Mississippi. Miss.Code Ann. § 265, provides that: "[E]very gift, grant, or conveyance of . . . goods or chattels, . . . by writing or otherwise; . . . had or made and contrived . . . to the intent or purpose to delay, hinder, or defraud creditors, . . . shall be . . . deemed and taken only as against the person or persons . . . whose debts, suits, demands, estates, or interests . . . shall or might be in any wise disturbed, hindered, delayed or defrauded, to be clearly and utterly void." Section 267 of said Code provides that the above mentioned section shall not extend to any estate or interest in any lands, goods or chattels, which shall be "upon good consideration and bona fide lawfully conveyed or assured to any person or persons."

The above Code sections, virtually a restatement of the Statute of 13 Elizabeth, c. 5, were accorded an instructive interpretation by the Mississippi Supreme Court in Blount v. Blount, 231 Miss. 398, 95 So.2d 545 (1957), a case which approvingly cited Pomeroy's following discussion:

"It should be observed that the statute, by its generality of expression, being without any such limitation, applies to both existing and subsequent creditors, and to both conveyances made upon a valuable consideration and those without any consideration. It does not declare voluntary conveyances void; it only pronounces *fraudulent* conveyances void, whether they are voluntary or made upon a consideration. The validity of a conveyance, as against creditors, is made in the proviso to depend 'upon its being upon a good consideration and *bona fide*'; either is not sufficient; consideration without good faith plainly does not displace the operation of the statute; and good faith without consideration does not necessarily protect a conveyance. A deed made upon a valuable consideration, but not *bona fide*,—that is, with a fraudulent intent,—is void against creditors of the grantor as though it were voluntary." [5] (Original emphasis)

In the case *sub judice*, the invalidity of the stock transfer has been established upon two grounds: (1) It was a voluntary conveyance of substantial property made without consideration, and therefore presumptively fraudulent, and (2) it was a conveyance not made in good faith but with intent to delay, hinder or defraud creditors.

Mississippi has long recognized the rule that where a debtor, especially when largely indebted, conveys a substantial portion of his property for a nominal consideration or by way of gift, the conveyance is presumptively fraudulent as to existing creditors, and the burden will rest upon the grantee to rebut the presumption by showing that the debtor retained property easily accessible to execution and amply sufficient in the ordinary course of events to satisfy his then existing legal liabilities. Odom v.

---

5. Pomeroy's Equity Jurisprudence, 3rd Ed. Vol. 2, p. 1793 ¶ 969.

Luehr, 226 Miss. 661, 85 So.2d 218 (1956); Golden v. Goode, 76 Miss. 400, 24 So. 905 (1899); Ames v. Dorrah, 76 Miss. 187, 23 So. 768 (1898). See 37 Am.Jur.2d, Fraudulent Conveyances, § 24, p. 48. The foregoing rule was applied by this court in Firestone Tire & Rubber Co. v. Hooker, 215 F.Supp. 482 (N.D.Miss.1963), to strike down as invalid against existing creditors a conveyance where the grantee was unable to show payment of a fair or adequate consideration. In case of a voluntary conveyance, the grantee has the "precise burden", Golden v. Goode, supra, of showing that the grantor had other property adequate to pay his debts. Here, the transfer by Pearson to Heard was without any consideration whatever as the court holds that it was an attempt by Pearson to place the stock in the hands of a nonresident transferee who was beyond the jurisdiction of the local courts, but in a manner not to interfere with his enjoyment of his investment in Classic Cleaners. At the time of transfer there was not only Philco's pending suit seeking judgment in excess of $35,000, but also an outstanding judgment of $812.52 against Pearson in favor of the Mississippi State Tax Commission.

Heard wholly failed to meet the legal burden required of him as gratuitous transferee and offered no credible evidence to offset the presumption of fraud arising under the circumstances. Certainly, grossly inaccurate financial statements which Pearson submitted to his bank, placed into evidence by plaintiffs, may not be seized upon as evidence of Pearson's solvency on November 1, 1966. Instead, the evidence compels only one conclusion to-wit: That the only property of significant value which Pearson owned on the date of the transfer was his stock which had a book value of about $17,500, and by transferring it to Heard, he was left without property sufficient to pay his existing creditors.

■ Assuming, *arguendo*, that Heard paid a valuable consideration, the transfer of the stock to him was nevertheless fraudulent since it was not made in good faith but to hinder Pearson's creditors. The *Blount* court specifically approved the text of the general rule in these words:

"The law will not permit one man to assist in cheating another, and when it appears that the parties to a transaction impugned for fraud were actuated by a motive which the statute denounces as fraudulent, to wit, to hinder, delay, or defraud creditors, it is utterly immaterial how valuable a consideration may have passed from the grantee or transferee, for the conveyance is none the less void in law." 37 C.J.S. Fraudulent Conveyances § 132, p. 960.

Courts often infer a fraudulent intention from circumstances attending a transaction from the presence of certain well-known labels or badges of fraud. These badges of fraud are suspicious circumstances which, if unexplained, warrant an inference of fraud, and the more common badges of fraud were thus enumerated in Reed v. Lavecchia, 187 Miss. 413, 193 So. 439 (1940):

"Inadequacy of consideration, transaction not in usual course or mode of doing business, absolute conveyance as security, secrecy, insolvency of grantor, transfer of all his property, attempt to give evidence of fairness by conscripting sister-in-law as a conduit for passing title to the wife, retention of possession, failure to take a list of the property covered by the conveyance which was commingled with some furniture and fixtures belonging to his father's estate, relationship of the parties, and transfer to person having no apparent use for the property."

■ The evidence is replete with at least ten suspicious circumstances which remain unexplained and may be fairly characterized as badges of fraud. These are:

(a) Pearson transferred the stock, his principal asset, at a time when he was heavily indebted, had an outstanding judgment against him for sales taxes, and was being sued by Philco

upon a large claim; after the transfer he was left without property subject to execution.

(b) The transfer was not made in the usual course of business and, while not secret, it was done through private negotiation and by signing instruments which were not subjected to public recordation or disclosure to creditors.

(c) Although the stock had a book value of $17,500 and Classic was obligated to pay Pearson $300 monthly until 1973, Pearson did not offer the stock to Triplett, the other stockholder, who was the person most likely to offer a top price for the stock in a bona fide sale.

(d) Heard, before purchasing the stock, made no inquiry of Classic or Triplett as to financial condition and after the purchase he was indifferent to the business operations of the corporation.

(e) Heard was actuated to make the transaction because of his other profitable relationships with Pearson, a person who was in known financial trouble when offering the stock to Heard for $10,000.

(f) The consideration paid, assuming one was paid, was under conditions designed to conceal the true intention of the parties, namely, to make an arrangement whereby Pearson could continue selling laundry equipment without fear of losing the stock to Philco. The parties cleverly contrived to give the transfer an appearance of fairness.

(g) Although the contract Pearson made with Heard covered both Pearson's stock and "all interest" in Classic Cleaners, Heard nevertheless allowed Pearson to continue drawing monthly payment from the corporation, thus foregoing claim to more than $12,000 paid to Pearson.

(h) The transfer was made under a provision allowing Pearson's wife to repurchase the stock within one year without profit to Heard.

(i) Heard acquiesced in Pearson's assertion that, notwithstanding the transfer, Pearson still had a voice in Classic's control and operation, "as manager of the Heard interest."

(j) Despite the transfer, Heard failed to list the stock bought for $10,000 as an asset on his financial records or financial statements submitted to banks for loan purposes.

A concurrence of numerous badges of fraud always makes out a strong case of fraud, 37 C.J.S. Fraudulent Conveyances § 79, p. 922, and so it is here. The court unhesitatingly holds that the evidence clearly and convincingly shows that Pearson and Heard made the transaction not in good faith but for the avowed purpose of defrauding creditors. Fraudulent and invalid, the stock transfer is set aside, and the stock ordered returned to the trustee in bankruptcy for the benefit of Pearson's creditors. Needless to say, Heard, a participant in the fraudulent scheme, is denied any claim against the impounded shares.

We agree with plaintiffs' further contention that the $300 payments received monthly by Pearson were, in fact, informal dividends paid by Classic and not salary for no services were rendered by him. Although the contract between Triplett and Pearson referred to compensation for Pearson as "Public Relations Director," it was in actuality an agreement between the two stockholders to distribute the corporate earnings from time to time without need of formally declaring dividends and thereby exposing the corporation to the payment of greater income taxes. It is noted that payments to Pearson were contingent upon company earnings, with the income to be shared equally between Pearson and Triplett without regard to what corporate office either might or might not hold or what service either might or might not perform. As their agreement flatly stated, there was to be an equal division of "all *income* derived from the operation of said business," with salaries in any case to be equalized between Triplett and Pearson "in whatever equal amounts the

company is able to pay." Undeniably, Pearson's contractual right to receive the $300 monthly payments was an incident of stock ownership, and the proceeds so received were a return on invested capital. This conclusion is reinforced by the fact that Triplett, despite his rendition of active manager's services to Classic, was without right to receive any different or greater sum than Pearson was paid. The payment by a corporation to its stockholders is, of course, a dividend when made as a return upon capital, 19 Am.Jur.2d, Corporations, § 804, p. 281, and whether made by formal declaration or informally, the "underlying idea of a cash dividend is the distribution in specie to its shareholders of a portion of the profits or surplus assets of the corporation . . . " Ibid § 814, p. 291. While dividends are customarily declared by formal action of the corporation, there may be a division of corporate profits without the formalities of a dividend declaration. This is especially true in the case of close corporations, or where all the shareholders agree to a division of profits. Ibid § 838, p. 313.

By their contract as the only stockholders of Classic, Pearson and Triplett agreed, for a ten-year term, upon the mode of distributing Classic's earnings and profits which rested upon an assumption that each party would continue to be the owner of one-half of the corporate stock. These contract rights were not a mere employment contract, but a fixed property right which obviously constituted "an interest" in Classic which by the terms of the Heard agreement passed to the transferee along with the shares themselves. Both Pearson and Heard so construed it, as Pearson was permitted by Heard to receive the funds without interruption. In the alternative, if the Pearson contract rights did not pass to Heard in the transfer, all right therein including the right to receive from Classic future distribution under the contract, vested in the trustee in bankruptcy as a chose in action belonging to the bankrupt.

█ Our holding that the payments of $12,150 were profit distributions or dividends, but not salary, does not render Heard liable therefor as a fraudulent transferee since he admittedly received no part of the funds. It would be highly inequitable to fix liability upon him where he did not share in the proceeds of checks which were turned over to the Pearsons and endorsed and cashed by them. Had Heard benefitted from the distributions, we would rule otherwise. Although there are decisions, upon which plaintiffs rely, that impose liability upon a transferee profiting from a fraudulent conveyance, they are not applicable where the transferor, as here, retained all the profits. Nor do plaintiffs have the right to recover from Pearson or his wife any distributions received by them prior to the filing of the petition in bankruptcy. Had the fraudulent transfer not been made, Pearson through May 1970 would have received and used the corporate distributions without any possible claim by Philco or other creditor that the bankrupt's estate should be so reimbursed. While Pearson arranged a fraudulent transfer of his stock, he was nonetheless allowed to receive the monthly remittances as his own, and this eventuality does not impose a new or independent personal liability upon him or his wife. We merely add that the question of whether personal liability on the part of Pearson for the debts owing to Philco and other creditors should be revived, and his discharge revoked, is altogether a matter of concern to the bankruptcy court, and not here.

Consistent with the foregoing, we hold that all dividends and earnings accumulated by Classic since May 11, 1970, and thus payable to the lawful holder and owner of Pearson's 25,000 shares of stock shall be paid by Classic to the trustee in bankruptcy, together with all future payments to be made by Classic as required distributions of such stock. All assets thus recovered in this action—stock, accumulated dividends, and future distributions—shall be handled by the trustee in accordance with directions of the bankruptcy court.

Let an Order be entered accordingly.