**In re DONDI FINANCIAL CORPORATION, Debtor.**

**Anthony M. MANCUSO, Trustee, Plaintiff,**

**v.**

**Ray CHAMPION, Defendant.**

**Bankruptcy No. 387–34093 RCM–7. Adv. No. 389–3789.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Aug. 28, 1990.

Philip I. Palmer, Jr., Dallas, Tex., for plaintiff.

T. Rick Frazier, Dallas, Tex., for defendant.

## AMENDED MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

Following are the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052 with respect to a trial held May 16 and 18, 1990. This is an 11 U.S.C. § 544(b) complaint by Anthony M. Mancuso, Trustee ("Plaintiff"), to recover bonuses and dividends paid by Debtor to Ray Champion ("Defendant"), a shareholder of Debtor owning shares of Class A common stock of Debtor. Plaintiff contends these bonuses and dividends were fraudulent conveyances by Debtor under the Texas Fraudulent Conveyance Act ("TFCA") in existence at the time in question.

### Background Facts

Debtor is a corporation formed and existing under the laws of the State of Texas.

Debtor filed a voluntary petition for relief under Title 11 on May 9, 1987.

Plaintiff was appointed as trustee of the Debtor on November 4, 1987.

This adversary proceeding was filed November 3, 1989.

Don R. Dixon ("Dixon") owned control of Debtor during pertinent times herein.

Debtor owned control of Vernon Savings and Loan Association ("Vernon").

At all times since at least August 1, 1985, Debtor, in addition to the property transferred, has had an insufficient amount of assets to pay the claims of its creditors in full; Debtor was insolvent within the meaning of 11 U.S.C. § 101(31) from at least August 1, 1985 forward. During all pertinent times herein, Defendant had no knowledge of Debtor's solvency problems. Such problems were due, in a large part, to fictitious loan transactions, which fictitiousness was not known to Defendant until after he ceased a relationship with the Dondi entities. There was no dispute that Defendant was acting in good faith throughout his dealings with Debtor.

At all times since December 1, 1984, there have been unpaid creditors who still hold unsecured claims. (Proofs of Claim Nos. 73, 74, 75, and 76).

Defendant was employed as an officer and director of various subsidiary entities of Vernon, a full time position with substantial duties and obligations. He was an employee of Dondi Commercial Properties, Inc., which was a subsidiary of Dondi Group, Inc., which was a subsidiary of Vernon.

Defendant's first Dondi-related employer was Dondi Residential Property, then he ran Dondi Properties Corporation. He continued to run this company all the time he was employed by a Dondi entity. He also worked for Dondi Commercial. He then helped with Vernon Service Corporation for one transaction. He thereafter worked for Dondi Group. Except for Vernon Service, all the entities for which he worked were owned by Dondi Group.

Debtor was a holding company and its only holding of value (in hindsight) was its ownership in Vernon, which in turn owned Dondi Group. Debtor was formed under the laws of the State of Texas and controlled by Dixon, who owned more than 51% of its stock at all pertinent times in this case. Debtor, in turn, owned over 96% of the capital stock of Vernon. In summary, Defendant's employment relationship to Debtor was: Defendant was an employee of a subsidiary of Dondi Group, Inc., which was a subsidiary of Vernon, itself a subsidiary of Dondi Financial Corporation. Pictorially, the main arteries of Debtor's business were as follows:

Dondi Financial Corporation
↓
Vernon Savings and Loan Association
↓
Dondi Group
↓
(various additional subsidiaries)

Vernon entered into a supervisory agreement with the Federal Savings and Loan Insurance Corporation on August 16, 1984. A cease and desist order was entered by the Federal Home Loan Bank Board on June 16, 1986.

The salary paid to Defendant was not bogus and the quarterly bonus program was part of the total employment benefits

offered by Debtor to key personnel of subsidiaries.

The right to buy stock in the Debtor's future was part of the total employment package for key personnel of subsidiaries; however, the amount of dividends on such stock was not related to employment performance.

Prior to January 1, 1984, Defendant owned 1,628 shares of Debtor, represented by Certificate No. 34.

On or about January 1, 1985, Defendant agreed to purchase an additional 261 shares of common stock of Debtor at a price of $102.50 per share.

Under the terms of the agreement, Defendant was to pay 15% as a cash down payment and finance the 85% balance, with interest only payable quarterly, and the principal payable five years later.

Defendant executed a promissory note in favor of Debtor for $23,737.95, payable in accordance with the above terms. Defendant paid off the $23,737.95 note.

Debtor issued its Stock Certificate No. 83 for 261 shares in the name of the Defendant.

Defendant simultaneously executed a pledge agreement securing the promissory note and placing his 261 shares in pledge.

On June 30, 1985, Defendant executed a proxy on all of his shares in favor of Dixon.

Debtor made the following payment to Defendant on the dates indicated for the purposes stated:

| Date | Purpose | $ Amount |
|---|---|---|
| January, 1985 | dividend | 1,174.50 |
| April, 1985 | deferred bonus | 440.56 |
| April, 1985 | dividend | 2,833.50 |
| July, 1985 | dividend | 2,833.50 |
| July, 1985 | deferred compensation | 2,730.14 |
| October, 1985 | dividend | 2,833.50 |
| January, 1985 | dividend | 2,833.50 |
| January, 1986 | deferred compensation | 5,490.61 |
| January, 1986 | dividend | 2,833.50 |
| April, 1986 | deferred bonus | 6,055.90 |
| April, 1986 | dividend | 2,833.50 |

Debtor continued to do business after such transfers. There was no allegation or proof that the Debtor's eventual cessation of doing business resulted in whole or in part from the transfers in question.

In connection with his purchase of the stock in Debtor, Defendant made the following payments to Debtor on the dates indicated:

| Date | $ Amount |
|---|---|
| January, 1985 | 418.92 |
| January, 1985 | 3,770.13 |
| May, 1985 | 667.63 |
| July, 1985 | 667.63 |
| October, 1985 | 667.63 |
| January, 1986 | 667.63 |
| April, 1986 | 667.63 |
| May, 1986 | 23,855.01 |

The May, 1986 check for $23,855.01 to Debtor was in full payment of the promissory note and remaining interest.

Debtor stamped the duplicate replacement promissory note as paid and returned it to Defendant, along with the 261 shares.

On June 2, 1986, Defendant wrote a letter to Dixon and others requesting that Debtor repurchase his 1,889 shares, but this was never done.

On December 21, 1987, Defendant filed a priority claim for $95,923.19.

Although the TFCA was replaced, effective September 1, 1987, by the Texas Fraudulent Transfer Act, the TFCA remains effective as to all transfers made before September 1, 1987. Acts 1987, 7th leg., ch. 1004, Section 2.

Section 24.02(a)(1) reads as follows:

(a) A transfer of real or personal property, a suit, a decree, judgment, or execution, or a bond or other writing is void with respect to a creditor, purchaser, or other interested person if the transfer, suit, decree, judgment, execution, or bond or other writing was intended to

(1) delay or hinder any creditor, purchaser, or other interested person from obtaining that to which he is, or may become, entitled; or ...

Under § 24.02(a)(1), any transfer made is fraudulent if intended to delay or hinder any creditor.

Plaintiff did not prove by sufficient evidence a violation of § 24.02(a)(1) with respect to either the bonuses or dividends.

## Limitations

Defendant pled the statute of limitations, but Plaintiff, as trustee, is given two years after his appointment in which to institute

avoidance actions. *In re Hansen*, 114 B.R. 927 (Bankr.N.D.Ohio 1990). This action was begun within that period. 11 U.S.C. § 546(a). The transactions were outside the range of 11 U.S.C. § 548 since they occurred more than one year prior to the filing of the bankruptcy petition.

Plaintiff has used § 544(b) to assert fraudulent conveyance claims of actual, existing unsecured claims and can do so if these claims were not barred as of the date of filing. *In re OPM Leasing, Inc.*, 40 B.R. 380 (Bankr.S.D.N.Y.1984). The underlying TFCA limitation period then in effect and applicable to a state fraudulent conveyance action was four years. *Texas Sand & Shield*, 381 S.W.2d 48 (Tex.1964); § 16.051 Tex.Civ. Practice & Remedies Code.

Since four years had not elapsed between January, 1985 (the date of the first transfer complained about), and the filing of the Chapter 11 on May 9, 1987, the Plaintiff's suit filed within two years of his appointment as trustee is timely under § 546(a).

### Transfers For Less Than Fair Consideration

Section 24.03(a) reads as follows:

(a) A transfer by a debtor is void with respect to an existing creditor of the debtor if the transfer is not made for fair consideration, unless, in addition to the property transferred, the debtor has at the time of transfer enough property in this state subject to execution to pay all of his existing debts.

Under § 24.03(a), a transfer is fraudulent if not made for a fair consideration by an insolvent debtor. *Burnett v. Chase Oil & Gas, Inc.*, 700 S.W.2d 737, 743 (Tex.Civ.App.–Tyler 1985); *Parker Square State Bank v. Huttash*, 484 S.W.2d 429 (Tex.Civ.App.–Ft. Worth 1972, writ ref'd n.r.e.); *Pope Photo Records, Inc. v. Malone*, 539 S.W.2d 224 (Tex.Civ.App.–Amarillo 1976).

Fair consideration means a reasonably equivalent benefit bestowed to the Debtor in exchange for the transfer. In discussing "fair consideration", most of the Texas cases are fact-specific on the particular transaction.

37 Am.Jur.2d *Fraudulent Conveyances* has some general conclusions concerning what constitutes "fair consideration".

Although a voluntary conveyance may under some circumstances be valid, lack of fair consideration is recognized to be a prime factor in determining whether a transaction is to be deemed fraudulent. 'Fair and valuable' consideration, as distinguished from adequate consideration, means that there shall be a substantial compensation for the property conveyed or that it shall be reasonable in view of surrounding circumstances. What constitutes a fair consideration under the Uniform Fraudulent Conveyance Act must be determined from the standpoint of creditors—that is, whether the debtor's estate has been unfairly diminished by his conveyance—and the existence of any intent to defraud on the part of either the grantor or the grantee is immaterial.

To determine fair consideration, the value of the property on the date of the transfer is the critical date against which the validity of the transfer must be tested.

37 Am.Jur.2d *Fraudulent Conveyances* § 18 "Generally; 'Fair Consideration' Defined", p. 708.

In determining the adequacy of the consideration, the courts will not weigh the value of the goods sold and the price received in very precise scales, but all circumstances considered, there should be a reasonable and fair proportion between the one and the other. Inadequacy of price does not mean an honest difference of opinion as to price, but a consideration so far short of the real value of the property as to startle a correct mind, or shock the moral sense.

37 Am.Jur.2d *Fraudulent Conveyances* § 19 "Adequacy of Consideration", p. 709.

An illegal consideration is not a valuable consideration within the meaning and operation of fraudulent conveyance statutes.

37 Am.Jur.2d *Fraudulent Conveyances* § 20 "What Constitutes Fair or Valuable Consideration", p. 711.

## I. THE DEFERRED BONUSES

■ Vernon had instituted a deferred compensation program for its direct and indirect employees.

The Plaintiff contends that Debtor received nothing in exchange for making the deferred compensation payments to Defendant. Defendant's regular salary, aside from deferred bonuses, was relatively low in comparison to the market. Because of the close intermixed relationship between the various Dondi entities and their identity of interests, Defendant's services to the subsidiaries amounted to fair consideration to Debtor and enhanced Dondi's stock ownership in Vernon.

The Court finds that there was fair consideration to the Debtor for the "downstream" transfer of deferred bonuses paid to the Defendant. *Lawrence Paperboard Corp. v. Arlington Trust Co.*, 76 B.R. 866, 871, 874 (Bankr.D.Mass.1987).

Intangible benefits that were conferred included maintenance of Debtor's financial strength through the retention of key personnel throughout the whole Dondi system. This identity of economic interest ultimately conserved the Debtor's estate for the benefit of creditors by keeping a competent downstream work force in place. *Rubin v. Manufacturers Hanover Trust*, 661 F.2d 979, 992 (2nd Cir.1981).

## II. DIVIDENDS

### A. *Liability Under Texas Corporation Law*

1. Statutory Liability.

■ The Plaintiff seeks to hold the Defendant Shareholder liable for dividends that were improperly declared under Art. 2.38 of the Texas Business Corporation Act ("TBCA"). Creditors are given a remedy under Art. 2.41 of the Act. This statute provides that the directors who authorized the improper dividends may be held liable to the creditors. However, the statute provides no cause of action for the creditors against the shareholders who received the dividends. The only statutory cause of action against shareholders for improper dividends in this section is found in Art. 2.41 subd. E. which gives a director who is found liable under this statute a right of contribution against any shareholders who received the dividends knowing that the distribution was improper. Thus, even if Defendant knew the corporation was insolvent at the time, the Plaintiff would have no standing under this statute because the only cause of action against a shareholder is given to a director. 15 Tex.Jur.3d, *Corporations* § 304.

2. Texas Common Law.

■ Neither is the Defendant liable under Texas common law. *Palmer v. Justice*, 322 F.Supp. 892 (N.D.Tex.1971) correctly states the law. In order for the Defendant Shareholder to be liable for the illegal dividends, two things must be proved. The corporation must 1) be insolvent and 2) have ceased doing business. Obviously, the Debtor was still conducting business at the time of the dividends. See also, *Comment, Shareholder's Liability for Dividends Improperly Declared and Paid*, 1 S.W.L.J. 220, 235–236. The case law on this issue is scant. Plaintiff has not produced any authority, nor has this Court been able to find any authority, which supports Plaintiff's position. Defendant cites the cases of *Palmer v. Justice, supra*, and *Temple Lumber Co. v. Pineland Naval Stores Co.*, 25 S.W.2d 675 (Tex.Civ.App.–Beaumont 1930, no writ) for the proposition that the only way the defendant shareholder can be held liable for improper dividends is if he had knowledge of the corporation's insolvency at the time he took them. The *Palmer v. Justice* court, at p. 895, pointed out that the plaintiff in that case, who, incidentally, is the attorney for the Plaintiff in this case, "did not argue that the transfer was fraudulent under the general fraudulent conveyance statute". Such court, at p. 895, was talking of shareholder innocence in terms of dividends or distributions in violation of the provisions of the TBCA. In *Temple Lumber Co., supra*, at

p. 677, liability was asserted under the "trust fund doctrine". As previously stated herein, for the trust fund theory to apply, there must be both insolvency and ceasing to do business by the corporation. In our case, Debtor continued to do business after the complained of transfers. Therefore, the trust fund theory (if it had been pled, which it was not) would not be applicable. The Court finds Defendant not liable under Texas Common Law for the improper dividends.

### B. *Liability as a Fraudulent Conveyance*

1. The Law.

Plaintiff also argues that the dividends which the Defendant received are fraudulent transfers under the old § 24.03 of the Texas Business and Commerce Code. Plaintiff does not now contend that, with respect to the dividends, there was an intent to hinder within the meaning of § 24.02(a)(1), but rather argues that dividends which are paid while a company is insolvent are, as a matter of law, fraudulent transfers, and a violation of § 24.03(a). The case law on this issue is scant and neither party submitted any briefs.

This issue was briefly discussed in *In re Kaiser Steel Corp.*, 87 B.R. 154 (Bankr.D. Col.1988). There, the court was ruling on a motion to dismiss a complaint, alleging a violation of the fraudulent conveyance law in connection with a leveraged buy out ("LBO") transaction. The court overruled the motion to dismiss the complaint. At p. 163, the court discussed part of the allegations in the amended complaint, which allegations and prayers for relief were 11 U.S.C. § 548 actions against the shareholders who received dividends while the corporation was insolvent. However, the court reached no conclusions.

In the case of *Powers v. Heggie*, 268 Mass. 233, 167 N.E. 314 (1929), the court found dividend payments to an innocent shareholder a fraudulent conveyance and held that the shareholder was liable. The court, at 167 N.E. 317, said:

> The good faith of the defendant in receiving the dividends, his belief that they were earned and were paid out of profits, his absence of knowledge that the corporation was insolvent or that the payment of the specific dividends would defeat, delay or defraud any existing creditor of the corporation, could not change the fact that the dividends received were mere gifts, nor operate to relieve him from the obligation to return them to the corporation or its creditors on demand.

Discussed in *Corporations—Stockholder's Liability to Refund Dividends*, 28 MICH. L.R. at 337 (Jan. 1930).

This view is expounded in *Comment, Shareholder's Liability for Dividends Improperly Declared and Paid, supra*, at 224. After citing *Powers*, the author argues that corporations should not be treated differently from any other debtor for the purposes of fraudulent conveyances saying, "[s]imply because the debtor happens to be a corporation to whom a few more devices are available, it should not be allowed to make fraudulent conveyances." *See also, Wood v. National City Bank*, 24 F.2d 661 (2nd Cir.1928) (opinion by Learned Hand). This issue is also addressed in Clark, *The Duties of the Corporate Debtor to its Creditors*, 90 Harv.L.Rev. 505 (1977). On page 558, the author complained about the "paucity" of case law on this issue and said:

> I would strongly argue that ... when a state has enacted a fraudulent conveyance statute, it ought to be interpreted as providing an *additional* set of restrictions that dividends and similar distributions must satisfy.

Other courts have also addressed the issue concerning recovery of dividend payments as fraudulent conveyances in the context of whether the payments were made with the intent to hinder, delay, defraud, etc. Almost all of these cases either involve the principal shareholders of a close corporation declaring dividends to themselves or a subsidiary declaring dividends to its parents while the company is insolvent. In the case of *In re Jenkins Landscaping & Excavating*, 93 B.R. 84, 88 (D.W.D.Va.1988), the Bankruptcy Court

held that declaration of a dividend to principal shareholders was a violation of the state fraudulent conveyance statute because it was made with specific intent to defraud. *See also, Ratchford v. Manchester Life & Cas. Management Corp.,* 679 F.2d 741 (8th Cir.1982).

*Philco Finance Corporation v. Pearson,* 335 F.Supp. 33 (N.D.Miss.1971) involved a transfer of stock made while the company was going under. The court found such transfer to be made with the intent to hinder. There were dividend rights with the stock transferred, but no dividends had been paid. The court, at p. 42, held there was no fraudulent transfer liability for the dividends because none were paid, but stated that, "[h]ad Heard benefitted from the distributions, we would rule otherwise."

*United States v. 58th Street Plaza Theatre, Inc.,* 287 F.Supp. 475, 491, 497, 499 (S.D.N.Y.1968) is a lengthy tax case where the court found that certain dividend payments by a close corporation were fraudulent transfers because (1) the corporation was insolvent and there was no consideration given; and (2) there was an intent to hinder. The court held the stockholders liable.

*United States v. Neidorf,* 522 F.2d 916 (9th Cir.1975) involved a suit by the government as a creditor against director/shareholders of the corporation who received dividends while the corporation was insolvent. This case dealt with the appropriate statute of limitations, but the court did state, at p. 918, that "[a] creditor may sue for restitution of such [dividend] payments ... without regard to any wrongdoing on the part of directors, officers or shareholders."

In *Regal Ware, Inc. v. Fidelity Corp.,* 550 F.2d 934 (4th Cir.1977), plaintiff alleged, among other things, that the board of directors declared illegal dividends. The District Court granted the motion to dismiss. The Fourth Circuit reversed and remanded, holding that a factual finding is required. The court also suggested, at p. 947, that the transaction might have been a fraudulent transfer. The case was remanded.

In *Fitzgerald v. Marshall,* 161 F.Supp. 470 (D.Col.1958), the trustee brought an action against directors of a debtor corporation for illegally-declared dividends. The court dismissed the suit because that state law cause of action is personal to the creditors. The court did suggest, at p. 472, that, if the trustee had proceeded under § 70(e) [now § 548], the result might have been different.

In *In re Ipswich Bituminous Concrete Products, Inc.,* 79 B.R. 511 (Bankr.D.Mass. 1987), the court found that a stock redemption that took place while debtor corporation was insolvent was for less than reasonably equivalent value, and thus, was a fraudulent transfer under § 548.

2. Fair Consideration.

If § 24.03(a) otherwise literally applies to the dividends, then the only way that the dividend payments would not be fraudulent transfers would be if Defendant gave fair consideration for them. The only conceivable way that Defendant could have given consideration would be if the dividend payments themselves were some form of compensation to Defendant for his services. However, the dividend payments themselves were not compensation.

It is clear that one of the benefits of the Defendant's employment was the *opportunity* to purchase this stock. Defendant received his stock in exchange for a note to Debtor. The Debtor's plan was generally for dividends from the stock to go towards paying off this type note. The best way to describe this is as a "leveraged stock purchase".

It is undisputed that Defendant paid a fair consideration for his stock interests substantially out of his own funds.

█ The opportunity to participate in the stock purchase was a form of compensation. The term used for the stock plan was "golden handcuffs", *i.e.,* to entice valuable employees of Debtor or its subsidiaries to remain with Debtor or its subsidiaries. Not only was the sale limited to certain key

employees, but the shareholder's agreement itself indicates that the purchase is based on employment. Article 2.01 of the agreement allows the debtor or its principals to repurchase the stock at the sale price (Art. 2.04) if the employment relationship ends. Article 3.01 restricts transfers of the stock. Article 4.01A provides, in addition to Art. 2.01, that if the purchaser enters into a "competing employment relationship" the debtor may repurchase the stock. These provisions illustrate how the purchase was in fact related to the defendant's employment.

The dividend payments were not connected to Defendant's services or performance. Even though the original stock purchase was related to Defendant's employment, *i.e.*, the right to buy the stock and be a part of Debtor's future, the bottom line on the dividend payments is that Defendant was paid according to his stock ownership, and the amount of the dividends was based, not upon the value of his services, but upon the fictional profit of Debtor. Thus, the evidence does not show (unlike the deferred bonuses) that Debtor received fair consideration for the dividends paid while Debtor was insolvent.

3. Conclusion.

This is a difficult issue, and there is little authority on the precise issue raised. Perhaps reasons why this issue has so seldom arisen are (a) because, in most instances, it makes no sense for a director to declare dividends improperly and subject himself to liability; (b) the amounts of dividends in many instances may not be worth the pursuit; and (c) it may have been assumed that the TBCA provided the exclusive remedies against stockholders. Turnover actions can be harsh, and especially in this instance. Looking at the plain language of the fraudulent conveyance statute, it appears that a dividend payment made while the debtor corporation was insolvent is a fraudulent conveyance. Thus, it is held that the three dividend payments, on or after August 1, 1985, totalling $8,500.50 were fraudulent transfers by the debtor that the Trustee may recover.

The *Kaiser Steel Corp., supra* court, at p. 160, had occasion to discuss the problems with the wording of statutes:

The Supreme Court has previously had occasion to rule as to the proper reading to be given a statute in face of the charge that the literal meaning would be at odds with the spirit and purpose of the act. In the case of *Crooks v. Harrelson*, 282 U.S. 55, 51 S.Ct. 49, 75 L.Ed. 156 (1930), the Supreme Court stated:

Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle [overriding the literal terms and plain meaning of a statute in order to avoid an absurdity so gross as to shock the general moral or common sense] so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter [citation omitted]. It is not enough that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the lawmaker himself, turn out to be mischievous, absurd, or otherwise objectionable. But in such case the remedy lies with the lawmaking authority and not with the courts [citations omitted]. 51 S.Ct. at 50–51. *See also, Garcia v. United States*, 469 U.S. 70, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).

In the recent case of *United States v. Nichols*, 841 F.2d 1485 (10th Cir.1988), the Tenth Circuit Court of Appeals similarly ruled upon the reading to be given the plain language of a statute. As the Tenth Circuit stated:

But the 'fact that [a Law] has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.' *United States v. Nichols*, 841 F.2d at 1493, *citing Sedima, S.P. R.L. v. Imrex Co.*, 473 U.S. 479, 499, 105 S.Ct. 3275, 3287, 87 L.Ed.2d 346 (1985).

This amended opinion amends and supercedes the prior memorandum opinion entered herein on July 18, 1990, which contained a mathematical error.