**In re ENRON CORP., et al., Reorganized Debtors.**

**Enron Corp. and Enron North America Corp., Plaintiffs,**

**v.**

**Bear, Stearns International Limited and Bear, Stearns Securities Corp., Defendants.**

**Bankruptcy No. 01 B 16034(AJG). Adversary No. 03–93388 A.**

United States Bankruptcy Court, S.D. New York.

April 27, 2005.

Togut, Segal & Segal LLP, by Frank A. Oswald, Howard P. Magaliff, of counsel. New York City, for Reorganized Debtors.

Squire, Sanders & Dempsey LLP, by Jeffrey A. Marks, of counsel, Cincinnati, OH, for the Official Committee of Unsecured Creditors.

Kramer Levin Naftalis & Frankel LLP, by Barry H. Berke, Stephen M. Sinaiko, of counsel, New York City, for Defendants Bear, Stearns International Limited and Bear, Stearns Securities Corp.

## MEMORANDUM OPINION DENYING DEFENDANTS' MOTION TO DISMISS COMPLAINT

ARTHUR J. GONZALEZ, Bankruptcy Judge.

The issue presented is whether the payment by an Oregon corporation for the purchase of its own shares in violation of an Oregon statute, which prohibits distributions by a corporation on account of its stock, can be considered a settlement payment protected from avoidance by section 546 of the Bankruptcy Code.

The Court holds that because, under Oregon law, an act in violation of the Oregon distribution statute is considered void, such action is a nullity and, as such, the underlying transaction cannot form the basis of a securities transaction that supports a settlement payment. Therefore, section 546 of the Bankruptcy Code does not protect such payment from the trustee's avoidance powers.

### FACTS

Commencing on December 2, 2001, and from time to time continuing thereafter, Enron Corporation ("Enron Corp.") and certain of its affiliated entities, (collective-

ly, the "Debtors"), including Enron North America Corp. ("ENA" and together with Enron Corp., "Enron") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004.

In May 2000, Enron entered into a transaction with Bear, Stearns International Limited ("BSIL") and Bear, Stearns Securities Corp. ("BSSC" and with BSIL, "Bear Stearns"). The terms of the transaction were recorded on Enron letterhead, dated December 28, 2000, and titled "Equity Forward Confirmation" (the "Confirmation"). The Confirmation also incorporated certain definitions and documents published by the International Swaps and Derivatives Association, Inc. (the "ISDA"), including the ISDA 1992 Master Agreement, ISDA's 2000 swap definitions, and ISDA's 1996 equity derivative definitions.

The Confirmation provided, among other things, that on May 24, 2001, Enron would purchase 323,000 shares of its own publicly-traded common stock from Bear Stearns. The Confirmation established the per-share price to be paid and the terms of the adjustments to be made to such price. In addition, rather than physically settle the contract by paying cash, Enron could elect to transfer shares of Enron common stock to Bear Stearns. This option was considered the virtual equivalent of payment by cash because there was a liquid market for Enron common stock during the relevant period. The Confirmation also provided that Bear Stearns had the right to terminate the transaction or demand immediate settlement of the transaction if the closing price of Enron common stock fell below a cer-

tain price per share for three consecutive days on the New York Stock Exchange. Further, the Confirmation indicated that it was the intent of the parties that the transaction did not give Bear Stearns "any of the rights that rank senior to a common shareholder of Enron Corp." Bear Stearns purchased Enron stock from third parties to hedge its contractual obligation to Enron.

Instead of Enron purchasing the common stock from Bear Stearns on the date contemplated by the Confirmation, the parties entered into an amended confirmation, dated June 14, 2001 (the "Amended Confirmation"), which postponed the termination date of the transaction to August 12, 2001. In recognition of the extended duration of the contract, the base per-share price to be paid by Enron to Bear Stearns was increased. In addition, the Amended Confirmation reflected a reduction in the per-share price of Enron common stock that would activate Bear Stearns' right to terminate or demand immediate settlement of the transaction.

Prior to the termination date set forth in the Amended Confirmation, the parties again reached agreement to modify the contractual terms. The alteration provided for a termination date of August 12, 2001, which was two days earlier than had been previously contemplated. The price per share was reduced slightly to reflect this reduction in time.

In accordance with this adjustment, on August 22, 2001, Enron paid Bear Stearns $25,904,602.50 and Bear Stearns transferred 323,000 shares of Enron common stock to Enron. Specifically, by agreement among the parties, the payment was made in two parts as Bear Stearns had decided to "settle the stock and the forward separately." The previously adjusted forward price of $80.20 per share was divided into the price per share of $36.68

and the "unwind price" of $43.52. Enron wired the funds in accordance with Bear Stearns' instruction to have $11,847,642.50, reflecting the price per share, including a $2.50 service charge, sent to BSSC for ENA's credit. The balance due of $14,056,960.00 as the "amount owed under the forward" or the "termination payment" was sent to BSSC for further credit to BSIL. In turn, Bear Stearns delivered securities to Enron through BSSC. At Bear Stearns' request, Enron Corp. purchased the stock from Bear Stearns through ENA. The stock was subsequently deposited in Enron Corp.'s Treasury account.

On November 25, 2003, Enron commenced this adversary proceeding seeking to recover the payment it made to Bear Stearns. Enron asserts that the payment is avoidable as a fraudulent transfer under sections 544(b) and 548(a) of the Bankruptcy Code. Specifically, Enron alleges that it was a "constructive" fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code and Oregon state law. Enron argues that its payment to Bear Stearns violated Oregon state law because it was an unlawful distribution in that it was a redemption of Enron common stock by Enron while it was insolvent.

On February 27, 2004, Bear Stearns filed a motion to dismiss the adversary proceeding, pursuant to Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 7012(b) and Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(b)(6), for failure to state a claim. Bear Stearns contends that the "safe harbor" provisions of section 546 of the Bankruptcy Code bar the relief sought by Enron. Enron opposes the motion to dismiss, arguing that the transfer in issue is not protected by the safe harbor provisions of the Bankruptcy Code. The ISDA, the Securities Industry Association and the Bond Market Association (collectively, "the Amici") obtained permission from the Court to file and filed, as Amicus Curiae, a memorandum of law, dated April 7, 2004, in support of Bear Stearns's motion to dismiss the adversary proceeding.[1] A hearing on this matter was held before the Court on October 28, 2004.

### DISCUSSION

Fed.R.Civ.P. 12(b)(6) is incorporated into bankruptcy procedure by Fed. R. Bankr.P. 7012(b). In considering a Fed. R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Id.*

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 106 S.Ct. 2932, 2944 92 L.Ed.2d 209 (1986). Thus, where more specific allegations of the complaint contradict such legal conclusions, "[g]eneral, conclusory allegations need not be credited." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995). Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000).

"Although bald assertions and conclusions of law are insufficient, the pleading

---

1. The Amicus brief was filed, generally, in support of the position taken by Bear Stearns in this adversary proceeding and by several other defendants in various other similar adversary proceedings filed by the Debtors.

standard is nonetheless a liberal one." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998). Pursuant to Fed.R.Civ.P. 8(a), which is made applicable to adversary proceedings by Fed. R. Bankr.P. 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Id.,* 355 U.S. at 47–48, 78 S.Ct. at 103. Based upon the liberal pleading standard established by Fed. R.Civ.P. 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997). In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter. *Id.*

In reviewing a Fed.R.Civ.P. 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken; *Brass v. Am. Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Indus. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991). However, mere notice or possession of the document is not sufficient. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). Rather, a necessary prerequisite for a court's consideration of the document is that a plaintiff relied "on the terms and effect of a docu-ment in drafting the complaint." *Id.* As such, the document relied upon in framing the complaint is considered to be merged into the pleading. *Id.* at 153 n. 3 (citation omitted). In contrast, when assessing the sufficiency of the complaint, the Court does not consider extraneous material because considering such would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. *Id.* at 154. Nevertheless, in considering a Rule 12(b)(6) motion, a court may consider facts as to which the court may properly take judicial notice under Rule 201 of the Federal Rules of Evidence ("Fed. R.Evid."). *In re Merrill Lynch & Co., Inc.,* 273 F.Supp.2d 351, 357 (S.D.N.Y. 2003), *citing, Chambers,* 282 F.3d at 153.

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh the evidence which may be offered to support it. *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998).

Thus, for the purposes of the Motion to Dismiss, the Court accepts as true all of the material allegations in the Plaintiff's complaint.

*The Complaint*

In the complaint (the "Complaint") filed in this adversary proceeding, Enron alleges that within one year of the Petition Date, Enron made payments to Bear Stearns totaling at least $25,904,602.50, in return for which it received 323,000 shares of Enron Corp. common stock that had no value to Enron, the issuer of the stock. In Count I of the Complaint, Enron seeks to avoid the payments it made to Bear Stearns as "constructive" fraudulent

transfers under section 548(a)(1)(B) of the Bankruptcy Code. In Count II of the Complaint, pursuant to section 544(b) of the Bankruptcy Code and Oregon state law, Enron seeks to avoid the payments as fraudulent transfers premised on its allegation that the payments were illegal distributions and, therefore, void under Oregon state law. In Count III of the Complaint, pursuant to section 550 of the Bankruptcy Code, Enron seeks turnover of any avoided transfers. In Count IV of the Complaint, Enron seeks a declaratory judgment that the payments violated Oregon state law as illegal distributions. In Count V of the Complaint, Enron seeks rescission of the agreements and restitution of the payments made based on unjust enrichment. In Count VI of the Complaint, pursuant to section 502(d) of the Bankruptcy Code, Enron seeks disallowance of Bear Stearns' claims against Enron unless there is a turnover of property for which Bear Stearns is liable.

### Avoidance of Transfers

■ Section 548(a)(1) of the Bankruptcy Code allows a debtor to avoid fraudulent pre-petition transfers on the basis of actual or constructive fraud. 11 U.S.C. § 548(a)(1). While fraudulent conveyance claims can be brought on either basis, claims based upon constructive fraud, pursuant to section 548(a)(1)(B) of the Bankruptcy Code, do not require proof of intent. *Official Comm. Of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Investment Co.)*, 274 B.R. 71, 82 (D.Del.2002). Section 548(a)(1)(B) provides that

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B).

Section 544(b)(1) of the Bankruptcy Code provides, in relevant part, that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." This section allows a trustee to avoid transfers voidable by an unsecured creditor under applicable law, including any relevant state law.

Enron alleges that, pursuant to sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code, it can avoid the payment made to Bear Stearns. Bear Stearns argues that the relief sought by Enron under these sections is precluded by section 546(e) of the Bankruptcy Code, which provides an exception to a trustees' avoidance powers, as it provides "safe harbors" for certain types of transactions.

### Exception to Avoidance for Settlement Payments

■ As noted, section 546 of the Bankruptcy Code provides a "safe harbor" for

certain types of transactions. The purpose of section 546 is "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions." *Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.)*, 913 F.2d 846, 848 (10th Cir. 1990) (hereinafter, "*Kaiser I*").

The routine purchase and sale of a security includes two opportunities for settlement, "street-side settlement" between the brokers and the clearing agencies and "customer-side settlement" between the broker and its customer. *See Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*, 952 F.2d 1230, 1237–38 (10th Cir.1991) (hereinafter "*Kaiser II*"). The proper functioning of the system depends on the "guarantees of performance made by all the parties in the chain affirming that they will honor their obligations despite a default by another party in the system." *See Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 476 n. 47 (S.D.N.Y.2001).

 In enacting the section 546(e) exception to the avoidance powers, the goal was to preserve the stability of these settled transactions to the extent that they are not fraudulent as defined in section 548(a)(1)(A) of the Bankruptcy Code. *Adler*, 263 B.R. at 477. If settled transactions could be reversed, it would undermine confidence in the system of guarantees and could lead to the "ripple effect" of bankruptcy filings by other participants in the chain of guarantees. *Id.* The purpose of section 546(e) of the Bankruptcy Code was "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348, 353 (N.D.Tex.1996) (quoting, H. Rep. No. 420, 97th Cong.2d Sess. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583).

When first enacted, 11 U.S.C. § 546 only applied to commodities market, however, in 1982, its scope was expanded to protect the securities market. *Kaiser I*, 913 F.2d at 848–49. Section 546(e) of the Bankruptcy Code provides that

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

Thus, section 546(e) provides a safe harbor for settlement payments. In connection with the securities trade, "settlement payment" is defined in section 741(8) of the Bankruptcy Code which provides that:

> "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

11 U.S.C. § 741(8).

In the context of the forward contract market, a "settlement payment" is similarly defined in section 101(51A) of the Bankruptcy Code as follows:

> "settlement payment" means, for purposes of the forward contract provisions of this title, a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment

commonly used in the forward contract trade.

11 U.S.C. § 101(51A).

In their analysis, courts first consider the language of section 546 and its incorporated reference to those Bankruptcy Code sections that define settlement payment. *Kaiser II,* 952 F.2d at 1237 (noting that a court must "apply the term 'settlement payment' according to its plain meaning"). The Bankruptcy Code sections defining settlement payment provide a list of settlement payments at various stages of the settlement process. Thus, several courts have noted that the definition of settlement payment in the Bankruptcy Code is not very helpful because the term being defined is merely repeated in the terms providing the definition. *See Walsh v. The Toledo Hosp. (In re Fin. Mgmt. Scis., Inc.),* 261 B.R. 150, 154 (Bankr.W.D.Pa.2001) (noting that in the context of the securities trade and the definition for settlement payment in section 741(8), the definition is not particularly illuminating "in that the definiendum appears as a term in the definiens"); *see also Official Comm. of Unsecured Creditors v. Asea Brown Boveri, Inc. (In re Grand Eagle Cos., Inc.),* 288 B.R. 484, 492 (Bankr.N.D.Ohio 2003) (noting that the definition is self-referring, in that it merely lists a variety of types of settlement payments); *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.),* 321 B.R. 527, 538 (9th Cir. BAP 2005) (noting that the definition "relies on a conclusory laundry list of securities industry terms of art that contain the words 'settlement payment' without articulating the elements of a settlement payment").

While some courts have concluded that this self-referring definition is ambiguous and does not lend itself to a plain meaning interpretation, *see generally Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Intern., Inc.),* 195 B.R. 971, 983 (Bankr. D.Mass.1996) (noting that definition is "as opaque as it is circular"), other courts consider that the statute is clear when read in the context of the securities industry. *See Kaiser II,* 952 F.2d at 1237 (noting that because "even the plain meaning of a term may depend on the context within which it is given, [the court] must interpret the term 'settlement payment' as it is plainly understood within the securities industry"); *see also Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.),* 181 F.3d 505, 515–16 (3d Cir.1999) (relying on plain language but, nevertheless, finding it consistent with intent).

Notwithstanding the "circular" definition of the term, certain courts have found it " 'extremely broad,' in that it clearly includes anything which may be considered a settlement payment." *Kaiser I,* 913 F.2d at 848. The intent of the definition is to cover all types of settlement payments "commonly used in the securities trade." *Kaiser II,* 952 F.2d at 1237 (noting that "a natural reading suggests ... this definition is 'extremely broad' "); *see also Resorts Int'l,* 181 F.3d at 515 (concluding that "the term 'settlement payment' is a broad one that includes almost all securities transactions"). *But see, Grafton,* 321 B.R. at 539 (noting that while the "rhetoric of decisions" references this definition as being broad, "reality is different").

The broad interpretation of "settlement payment" is considered consistent with the legislative intent of protecting financial markets from the instability that would result from the reversal of settled securities transactions. *Kaiser I,* 913 F.2d at 848. Nevertheless, while most courts conclude that the definition of settlement payment is extremely broad, they recognize that it is not "boundless." *Adler,* 263 B.R. at 475, 478 (concluding that sham bookkeeping entries that did not reflect actual

securities transactions were not settlement payments).

While the *Kaiser II* court acknowledged that it had ascribed a broad use to the term settlement payment, the court concluded that a trustee was protected by the availability of certain remedies including the ability to commence a damages suit or a similar action "against specific individuals or institutions for unlawful acts." *Kaiser II*, 952 F.2d at 1241.

The term settlement payment has been characterized as a technical word or term of art which requires reference to the industry usage of the term at the time of enactment. *Grand Eagle*, 288 B.R. at 492. As such, the *Grand Eagle* court found that the term settlement payment "requires the reader to consider extrinsic information and the final modifying phrase 'or any other similar payment commonly used in the securities trade' [as a] key to the intended meaning and use of that term." *Id.; see also Adler*, 263 B.R. at 475 (noting that it is clear that the provision is to be "defined with reference to the common understanding, practice and usage in the securities industry"). In *Grafton*, the Ninth Circuit Bankruptcy Appellate Panel concluded that the reference in section 741(8) to "or any other similar payment commonly used in the securities trade" provided a basis upon which to get around the circularity of the definition and discern the meaning of the term "settlement payment." *Grafton*, 321 B.R. at 538. The panel determined that the clause made clear that to come within the definition, the payment must be "restricted to the securities trade and must be 'commonly used.'" *Id.* As such, the court determined that it was required to examine the operation of trades in the securities industry. *Id.*

In the securities industry, "any transfer of cash or securities made to complete a securities transaction is considered a set-tlement payment." *Fin. Mgmt. Scis.*, 261 B.R. at 154. A settlement payment is a payment made to discharge a settlement obligation. *Kaiser II*, 952 F.2d at 1238 (citing Division of Market Regulation, Securities and Exchange Commission, *The October 1987 Market Break* at 10–5 (1988) (SEC Report)).

The *Kaiser II* court, however, acknowledged that the full definition of settlement could be inferred as limiting its application to routine "securities trades." *Id.*, 952 F.2d at 1239. This is because settlement is defined in the industry as "the completion of a securities transaction (i.e., a buyer pays for and a seller delivers the security purchased to the buyer.)" *Id.* at 1239 n. 7, (quoting, A. Pessin & J. Ross, *Words of Wall Street: 2000 Investment Terms Defined)*. In turn, transaction is defined as a term that is "[u]sed synonymously for a 'trade' (i.e., a completed agreement between a buyer and a seller)." *Id.* Although this reference to "securities trade" could result in an inference that only routine securities transactions were protected from avoidance, the *Kaiser II* court concluded that because neither section 546(e) nor 741(8), by their express terms, were limited to that definition of "securities contracts," or to "trades," it would not define "settlement payment" narrowly. *Id.* at 1239. The court refused to apply the term to a single type of securities transaction in light of the prevalence of a "wide scope and variety of securities transactions." *Id.* The *Kaiser II* court was also influenced by the fact that other sections of the Bankruptcy Code specifically applied limitations when intended while the relevant Bankruptcy Code sections it was considering did not have such limitations. *Id.*

Thus, the *Kaiser II* court applied the section to "the exchange of stock for consideration in [a leveraged buyout]" (the "LBO"). *Id.*, 952 F.2d at 1239. In reach-

ing this conclusion, the *Kaiser II* court compared the manner in which the shareholders involved with the LBO disposed of their shares with "the various other ways in which a shareholder's equity interest can be sold" and concluded that in substance these former shareholders involved in the LBO "effectively sold their equity interests to the new investors in exchange for money and a continuing stake in the new entity as preferred shareholders." *Id.* at 1240. As such, that transaction varied "only in form" from the way in which other shareholders tendered their shares and received payment. The court, therefore, concluded that these payments were also settlement payments. *Id.; see also Kaiser I*, 913 F.2d at 849–50 (citing lack of references to exceptional securities transactions in legislative section to note that the debtors' "position that section 546(e) only intended to insulate from avoidance routine securities transactions is not without merit" but, nevertheless, concluding that because of the diverse types of securities transactions, and absence of any restrictions in Bankruptcy Code sections defining settlement payment, "it would be an act of judicial legislation to establish such a limitation."); *Resorts Int'l*, 181 F.3d at 515 (noting that including payments made during LBO's within the scope of the definition of settlement payment is consistent with the broad meaning cases have applied to the term). Indeed, the term settlement payment has been applied to a "repo" or repurchase transaction which is not a "trade" entered on an exchange and which involves a different type of settlement process. *Kaiser II*, 952 F.2d at 1239, (citing *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n.*, 878 F.2d 742, 752 (3d Cir.1989)).

However, in *Munford v. Valuation Research Corp. (In re Munford)*, 98 F.3d 604, 610 (11th Cir.1996), *cert. denied*, 522 U.S. 1068, 118 S.Ct. 738, 739 (1998), the Eleventh Circuit held that section 546(e) did not apply to shield a constructively fraudulent LBO transfer from avoidance. The *Munford* court concluded that avoidance of the transfer would only impact shareholders, not brokers or financial institutions. *Id.* The *Munford* court's ruling was premised on its conclusion that the payment in issue was not made "by or to" any of the entities listed in section 546(e) because even though the payment may have been channeled through such entity, it acted merely as a conduit as it had not actually acquired a beneficial interest in the payment. *Id.* As a mere conduit, the *Munford* court concluded that such entity was not a transferee within the meaning of 11 U.S.C. § 550. *Id.* The Third Circuit disagreed with the conclusion reached in *Munford* and found that a plain reading of section 546(e) did not require that the entity handling the funds acquire a beneficial interest in them for the section to apply. *Resorts Int'l*, 181 F.3d at 516.

### Parties' Contentions

Pursuant to Fed.R.Civ.P. 12(b)(6), incorporated into bankruptcy procedure by Fed. R. Bankr.P. 7012(b), Bear Stearns moves to dismiss the Complaint based upon its contention that the safe harbor provisions of Bankruptcy Code section 546 bar Enron's avoidance claims. Specifically, Bear Stearns argues that, pursuant to section 546(e) of the Bankruptcy Code, the transfer in issue qualifies both as a "settlement payment" made by or to a stockbroker and as a "settlement payment" made by or to a forward contract merchant. In addition, Bear Stearns contends that the contract between Enron and Bear Stearns was a "swap agreement" and, therefore, pursuant to section 546(g) of the Bankruptcy Code, Enron's payment to Bear Stearns is excepted from avoidance as a transfer under a swap agreement that was

"made by or to a swap participant, in connection with a swap agreement."

In opposition to Bear Stearns's motion to dismiss, Enron first argues that Bear Stearns's motion to dismiss is procedurally flawed because it introduces extrinsic facts and attachments that are outside of the factual allegations contained in the Complaint and, therefore, cannot form the basis to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6). Enron also argues that the motion to dismiss, insofar as it is based on the safe harbor of section 546 of the Bankruptcy Code, is an affirmative defense that is not properly raised in a Fed.R.Civ.P. 12(b)(6) motion to dismiss as it does not appear on the face of the Complaint.

Apart from the procedural issues, Enron argues that the transfers are not protected by the safe harbor provided by section 546(e) because the transfers do not qualify as settlement payments "commonly used" in the securities and forward contract trade as required by that section. According to Enron, this is because, pursuant to Oregon state law, the transfers to Bear Stearns were illegal distributions to a shareholder of an insolvent company. Enron contends that Bear Stearns was a shareholder of Enron common stock and had expressly agreed to that status in the Confirmation. Enron further contends that the distribution from Enron to repurchase its shares of stock when it was insolvent could not properly be authorized or certified by its board of directors. Enron argues that, pursuant to Oregon law, the distribution by Enron to Bear Stems, as shareholder of Enron stock while Enron was insolvent, was not merely an ultra vires corporate act but, rather, an illegal and void corporate act that is unenforceable in any context. Further, Enron contends that it may pursue a remedy against Bear Stearns because, under Oregon law, the invalidity of the transaction may be asserted by any party whose rights are affected. Therefore, Enron maintains that as a void corporate act, the void and illegal transfer cannot be considered a "commonly used" payment in the forward contract trade or securities trade as required by the applicable Bankruptcy Code sections. In addition, Enron argues that the Oregon state law is not preempted by the safe harbor provisions of the Bankruptcy Code because the Oregon state law is congruent with the Bankruptcy Code. Moreover, Enron argues that the purpose of section 546(e) to protect the chain of guarantees is not implicated in this case because if the transfers at issue were already recoverable under Oregon state law, their avoidance in a bankruptcy action would not result in further disruption to the markets.

In reply to Enron's opposition, Bear Stearns first argues that the motion to dismiss is procedurally proper. Bear Stearns contends that on the motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court may properly consider the Amended Confirmation and the agreement entered into by the parties as reflecting the terms of the transaction that is the subject of the Complaint. Moreover, Bear Stearns urges that the balance of the allegedly extrinsic facts at issue, including the status of the parties as stockbrokers, are properly before the Court because they are matters of which the Court may take judicial notice pursuant to Fed. R.Evid. 201. Further, Bear Stearns contends that an affirmative defense can form the basis for dismissal where the facts that establish the defense can be ascertained from the allegations in the complaint, documents therein incorporated, matters of public record and matters of which the court may take judicial notice. Bear Stearns maintains that its safe harbor defense in this case can be ascertained from those sources.

With respect to the substantive issues, Bear Stearns maintains that the Oregon state law referenced was not violated. Bear Stearns further argues that even if a violation of that law were found, controlling Oregon state law precludes a claim by Enron against Bear Stearns as the Oregon statutory scheme does not provide Enron with standing to assert any action against Bear Stearns. In addition to its argument that the Oregon state law does not provide Enron with a remedy, Bear Stearns argues that even if Oregon law permitted recovery from Bear Stearns, Enron cannot "relabel" the avoidance claims as other types of claims to evade the "safe harbors" contained in section 546 of the Bankruptcy Code because that section preempts state law.

*Procedural Issues*

■ In reviewing this Fed.R.Civ.P. 12(b)(6) motion, the Court may properly consider the Amended Confirmation and the agreement entered into by the parties which reflect the terms of the transaction that is the subject of the Complaint. The Confirmation describes the terms of the transaction between the parties. Enron referenced the Confirmation in the Complaint and relied upon its terms and the terms of the agreement in drafting the Complaint.

■ In addition, the Court agrees with Bear Stearns that the balance of the allegedly extrinsic facts in issue, including the status of the Bear Stearns parties as stockbrokers and Enron as a forward contract merchant, are properly before the Court because they are matters of which the Court may take judicial notice pursuant to Fed.R.Evid. 201. Pursuant to the Fed.R.Evid. 201, a court may take judicial notice of a fact if it is "not subject to reasonable dispute" because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201(b)(2). Bear Stearns presented excerpts from the records of various public or quasi-public bodies establishing that BSSC is a registered broker-dealer with the Securities and Exchange Commission (the "SEC"), the securities regulators of various states, the National Association of Securities Dealers (the "NASDR") and certain other self-regulatory organizations.[2] In addition, BSSC is a member of the Securities Investor Protection Corp.[3] and the National Securities Clearing Corp.[4] BSIL is registered with the United Kingdom Financial Services Authority[5] and has been authorized to hold and control client money there since January 12, 2001.

---

2. For example, BSSC is listed on the website of the National Association of Securities Dealers (www.nasd.com) as a broker-dealer registered in numerous states, including Oregon since 6/28/91, in New York since 5/21/91 and in Texas since 6/11/91. *See* http://pdpi6.nasdr.com/pdpi/master_report_frame.asp?Subject=28432 & Subject_Name=BEAR' + STEARNS + SECURITIES + CORP. & SubjectType=F (last visited on April 25, 2005). In addition, the NASDR lists BSSC as a clearing broker, clearing agent and notes that it "[e]ffects transactions in commodity futures, commodities, commodity options as

broker for others or dealer for own account." *See* http://pdpi6.nasdr.com/pdpi/master_report_frame.asp?Subject=28432 & Subject_Name=BEAR' + STEARNS + SECURITIES + CORP. & SubjectType=F (last visited on April 25, 2005).

3. *See* http://www.sipc.org/who/process.cfm (last visited on April 25, 2005).

4. *See* http://www.nscc.com/directory/directory.pdf at p. 9 (last visited on April 25, 2005).

5. *See* http://www.fsa.gov.uk/register/(last visited on April 25, 2005).

Moreover, Bear Stearns has provided excerpts from SEC filings describing BSIL and BSSC as operating as broker-dealers. Bear Stearns also provided excerpts of Enron Corp. filings with the SEC which describe Enron's forward contract trading activities. Therefore, the Court concludes that BSSC and BSIL are broker-dealers and that Enron is a forward contract merchant as those terms are referenced in section 546 of the Bankruptcy Code.

■ The final procedural issue concerns Enron's contention that Bear Stearns cannot raise the argument concerning the safe harbor in the context of a Fed.R.Civ.P. 12(b)(6) motion because it is an affirmative defense. However, where a Rule 12(b)(6) motion raises an affirmative defense that appears on the face of the complaint, the complaint can be dismissed. *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 158 (2d Cir.2003). Whether the safe harbor of section 546 of the Bankruptcy Code is or is not a bar to the avoidance claim is a matter of law that can be determined based on the confirmations and the allegations of the Complaint.

### Requirement to Qualify as Settlement Payment

■ The Court concludes that in order to qualify as a settlement payment that is protected by the safe harbors, the settlement payment must be "commonly used" within the industry. As previously noted, the reference in section 741(8) to "or any other similar payment commonly used in the securities trade" provides a basis upon which to get around the circularity of the definition and discern the

meaning of the term "settlement payment." *See Grafton,* 321 B.R. at 538.[6]

Enron notes that when a corporation repurchases its own shares to be held in its treasury, the corporation does not acquire anything of value that corresponds to the depletion of its assets. Rather, such a transfer is a way to distribute to stockholders corporate assets, which should be available to pay creditors prior to stockholders. Enron argues that pursuant to Oregon Revised Statutes ("Or.Rev.Stat.") § 60.181 (2003), agreements by a corporation to repurchase its own stock entered into when the corporation is insolvent, under a statutory solvency test, are illegal and unenforceable. Enron further argues that because the transaction in issue is considered void under Oregon law, it actually did not "settle" and, therefore, is not protected by the safe harbor of section 546 of the Bankruptcy Code. Enron urges that "no common trade usage would consider an illegal payment to constitute a bona fide settlement payment." Enron further argues that to consider an illegal payment to be common in the industry would be contrary to the "terms, history, and purpose" of the statute. At a minimum, Enron argues that trade usage is a quintessential fact issue that requires extrinsic evidence and expert testimony.

Or.Rev.Stat. § 60.181, entitled Distributions to Shareholders provides, in relevant part, that

(1) A board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and the limitation in subsection (3) of this section.

. . . .

6. The same analysis would apply to the definition of "settlement payment" in section 101(51A) of the Bankruptcy Code as it would

have to be "commonly used in the forward contract trade" to give any substance to the listed settlement payments.

(3) A distribution may be made only if, after giving it effect, in the judgment of the board of directors:

(a) The corporation would be able to pay its debts as they become due in the usual course of business; and

(b) The corporation's total assets would at least equal the sum of its total liabilities plus, unless the articles of incorporation permit otherwise, the amount that would be needed if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

OR. REV. STAT. § 60.181.

In support of its position, Enron directs the Court's attention to an Oregon state court case, *Field v. Haupert,* 58 Or.App. 117, 647 P.2d 952 (1982), that interpreted a predecessor anti-distribution statute to Or. Rev.Stat. § 60.181. Enron maintains that the predecessor statute is identical in substance to Or.Rev.Stat. § 60.181. In analyzing the predecessor statute, the *Field* court determined that an insolvent corporation's repurchase of its stock in violation of the statute was an illegal corporate act and, therefore, void and unenforceable. *Field,* 647 P.2d at 953. The facts of the *Field* case were that a corporation entered into a transaction with a former officer of the corporation which included the repurchase of the officer's shares of stock. The transaction was structured to provide a cash payment to the officer with the balance payable pursuant to a promissory note. One of the stockholders of the corporation who was also a director provided a guarantee of payment on the note. When the corporation defaulted in payment on the note, the officer sued the shareholder/director who, in turn, raised the violation of the Oregon statute as an affirmative defense. The Oregon state court concluded that asserting the violation of the statute "is a complete defense" to an effort to enforce the guaranty. *Field,* 647 P.2d at 954. In reaching this conclusion, the *Field* court distinguished those acts of a corporation that were merely beyond a corporation's "capacity or power" and were considered "ultra vires" from those that were illegal or void. *Id.* at 953–54. The *Field* court concluded that an act of a corporation in violation of a law that specifically prohibits the action is illegal and unenforceable. *Id.* at 954; *see also Minnelusa Co. v. Andrikopoulos,* 929 P.2d 1321, 1324 (Colo.1996) (en banc) (comparing various state court interpretations regarding whether corporate stock repurchases by an insolvent corporation are void or voidable and noting that Oregon concludes that such transactions are void).

Enron contends that Or.Rev.Stat. § 60.181 is comparable to the predecessor statute analyzed in *Field,* which would render payments violating section 60.181 illegal and void under Oregon state law. Enron argues that such void payments should not receive protection under bankruptcy law. Enron maintains that because illegal and void distributions are not "commonly used" in either trade, they are not settlement payments as defined by either Bankruptcy Code section 101(51A), concerning forward contracts, or section 741(8), concerning settlement payments used in the securities trade. Enron contends that as a result, such distributions are not "within the statutory scope of a settlement payment." In any case, Enron argues that the motion to dismiss is premature because the Court cannot determine whether illegal distributions to shareholders by an insolvent company are settlement payments commonly used in the securities or forward contract trades without considering Enron's extrinsic evidence and expert

testimony on the factual issue of trade usage.

Bear Sterns counters that it has not violated the Oregon statute and that, regardless of whether it violated the Oregon state law, Enron's attempt to avoid the transfer is barred by section 546 of the Bankruptcy Code because that section preempts inconsistent state law. Bear Stearns contends that the state law is preempted on the basis of either conflict or field preemption. Bear Stearns maintains that conflict preemption applies because the purpose of section 546 of the Bankruptcy Code is to ensure stability and finality in the securities market and that enforcing the Oregon statute would pose an obstacle to that objective. Bear Stearns also maintains that field preemption applies because the safe harbor provisions of the Bankruptcy Code form a comprehensive scheme that displaces inconsistent state law claims and remedies.

Bear Stearns cites *Official Committee of Unsecured Creditors of Hechinger Investment Co. v. Fleet Retail Finance Group (In re Hechinger Investment Co.)*, 274 B.R. 71 (D.Del.2002) to argue that Enron cannot rely on the same facts to assert a state law claim in an effort to seek essentially the same relief that is precluded by the safe harbor section of the Bankruptcy Code. In the *Hechinger* case, the court precluded the debtor from availing itself of a state law claim for unjust enrichment where the result would have been to circumvent the safe harbor of section 546 of the Bankruptcy Code. *Id.* at 96. The *Hechinger* court reasoned that a state law unjust enrichment claim could not be used to frustrate the protections afforded by the Bankruptcy Code with respect to a "transaction that the court has already found is an unavoidable settlement payment." *Id.*

Here, however, Enron is asserting that because of the violation of the Oregon state law, the transaction does not qualify as a "settlement payment" in the first instance and, therefore, does not fall within the statutory protection of section 546 of the Bankruptcy Code. As such, Enron argues that the Bankruptcy Code is congruent with the Oregon state law and neither conflict nor field preemption apply. Enron maintains that the purpose of section 546 of the Bankruptcy Code is to protect the securities market from the disruption that could ensue if one of the entities in the chain of guarantees filed for bankruptcy protection. Enron contends that this goal is not implicated under the facts of this case because the transfer in issue already was recoverable from Bear Stearns under Oregon state law. Enron argues that as a consequence, avoidance of that transfer in a bankruptcy proceeding will not result in any further disruption to the markets than otherwise could have occurred absent a bankruptcy filing.

Bear Stearns, however, contends that the concern about compromising the chain of guarantees in the securities market and the potential for a "ripple effect" in that link was not incorporated in the plain language of the section and resort should not be made to the legislative history to interpret the plain meaning of section 546 of the Bankruptcy Code.

Further, Bear Stearns contends that even if the Oregon statute were violated, Enron could not pursue a cause of action based on that violation directly against a stockholder for recovery of any unlawful distribution. Bear Stearns argues that Or. Rev.Stat. § 60.367 governs liability for distributions made in violation of Or.Rev.Stat. § 60.181. Or.Rev.Stat. § 60.367, entitled Unlawful Distributions provides:

(1) Unless the director complies with the applicable standards of conduct described in ORS 60.357, a director who votes for or assents to a distribution

made in violation of this chapter or the articles of incorporation is personally liable to the corporation for the amount of the distribution that exceeds what could have been distributed without violating this chapter or the articles of incorporation.

(2) A director held liable for an unlawful distribution under subsection (1) of this section is entitled to contribution:

(a) From every other director who voted for or assented to the distribution without complying with the applicable standards of conduct described in ORS 60.357; and

(b) From each shareholder for the amount the shareholder accepted knowing the distribution was made in violation of this chapter or the articles of incorporation.

OR. REV. STAT. § 60.367.

Bear Stearns maintains that, pursuant to the Oregon statutory scheme, a director found liable of an unlawful distribution may seek contribution from a shareholder, however, the corporation itself may not maintain a direct action against a shareholder.

In support of its position, Bear Stearns cites to cases interpreting Tennessee and Texas statutes that are similar to Or.Rev. Stat. § 60.367; *see Still v. Fuller (In re Southwest Equip. Rental, Inc.)*, No. 1–88–00033, 1992 WL 684872, at *14 (E.D.Tenn. July 9, 1992) (applying TENN. CODE ANN. § 48–18–304); *Mancuso v. Champion (In re Dondi Fin. Corp.)*, 119 B.R. 106, 110 (Bankr.N.D.Tex.1990) (applying TEX. BUS. CORP. Act § 2.41(E)).

In *Southwest*, the trustee sought to hold various defendants liable for their participation in an unlawful distribution to shareholder while the corporation was insolvent in violation of a Tennessee statute. *Southwest*, 1992 WL 684872, at *12. Bas-

ing its decision on the "language and structure" of the state statute, the court concluded that the only shareholder liability arising from the statute in connection with an unlawful distribution was "one for contribution owed to a culpable director." *Id.* at *13–14.

In *Dondi*, a trustee sought to recover from shareholders, for the benefit of creditors of the corporation, certain dividends that were improperly paid in violation of a Texas statute. *Id.*, 119 B.R. at 110. The court, basing its decision on the statutory framework, determined that the only statutory cause of action against the shareholder arising out of the improper dividend was an action for contribution by the director against any shareholder who received the dividend with knowledge of its impropriety. *Id.* The court concluded that under the Texas statute, creditors have no standing to assert a cause of action directly against a shareholder. *Id.* The *Dondi* court's determination, however, was limited to a creditor's standing to pursue the remedy sought under the statute. The *Dondi* court recognized that creditors precluded from pursuing relief under the statute might, nevertheless, have a basis upon which to proceed directly against a shareholder under the common law. *Id.* The *Dondi* court proceeded to analyze whether relief was available under a Texas common law trust-fund theory but concluded that, under the particular facts of the case, the elements required for that relief were not met and denied the relief sought against the shareholder. *Id.*, 119 B.R. at 110–111.

Enron cites *Stanley v. Brock (In re Kettle Fried Chicken of America, Inc.)*, 513 F.2d 807 (6th Cir.1975), where the court disagreed with the analysis of *Southwest* and *Dondi*. In interpreting Delaware law, the *Kettle* court concluded that even where a statute provides for a direct remedy against a director but does not provide for

a direct remedy against a shareholder, a court can imply such a remedy. *Id.* at 814. The *Kettle* court's view was that the remedies available are cumulative and that the specific remedy authorized against directors should not be read to "relieve shareholders of liability." *Id.*

Bear Stearns counters with *PHP Liquidating LLC v. Robbins*, 291 B.R. 592 (D.Del.2003), where the court disagreed with the *Kettle* court's analysis and concluded that it was not consistent with "Delaware's statutory scheme." *Id.* at 598. The *PHP* court determined that because the Delaware statute specifically listed the circumstances under which that statute could be asserted, implying an additional cause of action "would undermine the established statutory scheme." *Id.*

As previously noted, an Oregon appellate court determined that an action in violation of the predecessor statute to Or. Rev.Stat. § 60.181 is void. The thrust of Enron's argument is that an action, taken in violation of Oregon's unlawful distribution statute, that is void cannot be considered a normal completion of a securities transaction. Consequently, Enron maintains that a distribution made in violation of the Oregon unlawful distribution statute cannot be considered a settlement payment protected from avoidance by section 546 of the Bankruptcy Code. Thus, the viability of Enron's argument depends on the substantial similarity of the predecessor statute interpreted in *Field* to the current Oregon unlawful distribution statute, Or.Rev.Stat. § 60.181.

When *Field* was decided, the predecessor statute in force concerning this issue provided:

No purchase of or payment for its own shares shall be made at a time when the corporation is insolvent or when such purchase or payment would make it insolvent.

*Field,* 647 P.2d at 953, (citing ORS § 57.035(5)).

In 1983, an amendment to ORS § 57.035(5) deleted the reference to "payment." *Hansen v. Singmaster Ins. Agency, Inc.,* 80 Or.App. 329, 722 P.2d 1254 (Or.Ct.App.1986), (citing 1983 Or. Laws, ch 611, § 2). In 1985, a Task Force was formed by the Oregon State Bar's Business Law Section to consider the then-existing Oregon corporate law and the 1984 REVISED MODEL BUSINESS CORPORATION ACT (the "1984 RMBCA") issued by The Committee on Corporate Laws of the American Bar Association Section of Business Law Act for the purpose of developing a bill for submission to the Oregon state legislature. *See* Robert C. Art, *Business Corporation Act: Corporate Shares and Distributions in a System Beyond Par: Financial Provisions of Oregon's New Corporation Act ("Financial Provisions"),* 24 WILLIAMETTE L.REV. 203, 226–27 (1988) (citing Task Force Report, Oregon Revised Model Business Corporation Act (Or. St. Bar, Mar 24, 1987)). The Task Force drafted the 1987 OREGON BUSINESS MODEL CORPORATION ACT (the "1987 Act").[7] *See Task Force Report: Oregon Revised Model Business Corporation Act ("Task Force Interpretive Note"),* 30 WILLIAMETTE L. REV. 407 (1994). In 1987, the predecessor section was repealed and Oregon adopted Or.Rev.Stat. § 60.181 as part of the 1987 Act. *Id.* The legislative history to Or.Rev.Stat. § 60.181 indicated that the 1987 Act adopted section 6.40 of the 1984 RMBCA without change. 1987 Or. Laws, c. 52, § 48. A subsequent article written

---

**7.** The Task Force submitted written material as testimony to the legislative committees considering the adoption of the 1987 Act and subsequent amendments. *See Task Force Report: Oregon Revised Model Business Corporation Act,* 30 WILLIAMETTE L. REV. 407 (1994).

by a member of the Task Force asserted that section 60.181 was substantially similar to section 6.40 of the 1984 RMBCA, with minor drafting changes. *See* Robert C. Art, *Financial Provisions,* 24 WILLIAMETTE L.REV. at 226 n. 140. The 1987 Act was intended to promote Oregon's economic development. *Id.* at 228. Consideration of the overall bill proceeded quickly with what "limited legislative attention" there was focused on the provisions concerning indemnification and exculpation of directors. *Id.* As enacted, subsection (3) of section 60.181 provided

> No distribution may be made if, after giving it effect:
>
> (a) The corporation would not be able to pay its debts as they become due in the usual course of business; or
>
> (b) The corporations's total assets would be less than the sum of its total liabilities plus, unless the articles of incorporation permit otherwise, the amount that would be needed if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

OR. REV. STAT. § 60.181(3) (1987); *see also* RMBCA § 6.40.

The legislative history indicated that this section of the 1987 Act was important to its redesigned financial structure which was intended to take account of the "true economic effect of distribution." 1987 Or. Laws, c. 52, § 48. It was also noted that if either of the two statutory tests concerning solvency were not met, the distribution was "prohibited." *Id.* This is consistent with the reasoning of the *Field* court which relied on the fact that the purchase agreement involved there was prohibited by the predecessor statute. *Field,* 647 P.2d at 954.

In 1989, subsection (3) was amended to read as follows

> A distribution may be made only if, after giving it effect, in the judgment of the board of directors
>
> (a) The corporation would be able to pay its debts as they become due in the usual course of business; and
>
> (b) The corporation's total assets would at least equal the sum of its total liabilities plus, unless the articles of incorporation permit otherwise, the amount that would be needed if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

OR. REV. STAT. § 60.181(3) (1989). According to the legislative history, the change to subsection (3) was for the purpose of eliminating a double negative and improving readability. 1989 Or. Laws, c. 1040, § 13; *see also* Practice Commentary, 1 OREGON LAW AND PRACTICE § 60.181 (2004) (noting that the amendment modified subsection (3) by removing a double negative and providing that the tests are met in the judgment of the board of directors rather than by an absolute standard); *Task Force Interpretive Note,* 30 WILLIAMETTE L. REV. at 438.

The 1987 Act also included section 60.367 which adopted section 8.33 of the 1984 RMBCA. Pursuant to Or.Rev.Stat. § 60.367, a director is liable for an unlawful distribution if the director either voted for or assented to it. A director held liable under this section is entitled to contribution from other directors who approved the distribution or from shareholders who accepted distributions knowing of its impropriety. *See* 1987 Or. Laws, c. 52 § 88.

The Oregon legislative history to Or. Rev.Stat. § 60.367 indicated that the sec-

tion was consistent with existing law concerning unlawful distributions. Indeed, it is specifically noted that a director held liable for an unlawful distribution is entitled to contribution from other directors who approved the distribution and from shareholders who knew of the impropriety "as is the case under [the predecessor Oregon statute.]" 1987 Or. Laws, c. 52, § 88.

Thus, aside from the restructured financial solvency tests applied, it appears that the Oregon statutory sections relevant to unlawful distributions are substantially similar to the predecessor sections in effect when the *Field* case was decided. There was no mention in the legislative history of any intent to overrule the holding of the *Field* case. The Court cannot interpret the change in the wording of Or.Rev.Stat. § 60.367 as a nuance intended to overrule that case when there is no mention of such intent. Further, in the legislative history, it is expressly stated that the alteration in the wording was merely intended to remove a double negative and make the section easier to read.[8] 1989 Or. Laws, c. 1040, § 13; *see also* Practice Commentary, 1 OREGON LAW AND PRACTICE § 60.181. (2004); *Task Force Interpretive Note*, 30 WILLIAMETTE L. REV. at 438.

In the legislative history to Or.Rev.Stat. § 60.181, it is noted that a distribution violating the statute is "prohibited." 1987 Or. Laws, c. 52, § 48. In accordance with the *Field* case, under Oregon law, a distribution that is prohibited by the statute is

considered void. In turn, void is defined as "of no legal effect, null." BLACK'S LAW DICTIONARY (8th ed.2004). The definition further indicates that the term "void" is "applied only to those provisions that are of no effect whatsoever—those that are an absolute nullity." BLACK'S LAW DICTIONARY (8th ed.2004).

■ If a transaction were unlawful under the statutory scheme then, as a matter of Oregon law, a party seeking payment could not have enforced the obligation against a corporation because the transaction was a nullity. Therefore, if Enron had defaulted in the payment obligation and were proven insolvent, under Oregon law, Enron could not have been forced to pay. A settlement payment is a payment made to discharge a settlement obligation. If the Oregon law was violated, the payment cannot be a settlement payment because the transaction is void and there is no settlement obligation to discharge nor any securities transaction to complete. Thus, if it is established that Enron was insolvent, pursuant to Oregon law, the transaction would be void and have no legal effect at all. As a complete nullity, there would be no resulting settlement payment. This consequence is not a result of the bankruptcy filling, it is simply a function of state law that was not preempted by 546(e). The safe harbors were enacted to preserve markets by protecting payments made regarding securities transactions, not to create markets by protecting securities transactions that are a "nullity" under state law.

---

**8.** Although, it has been noted that there was a general understanding that adoption of the 1987 Act, as substantially similar to the RMBCA, would permit for its interpretation by resort to the law of other jurisdictions which adopted similar statutes, *see* Robert C. Art, *Financial Provisions*, 24 WILLIAMETTE L.REV. at 227, nevertheless, at least with respect to the sections referenced, aside from restructuring the financial solvency tests applied, there was no specific intent to overturn or modify the sections or the case law interpreting them. Rather, as indicated above, in the legislative history to Or.Rev.Stat. § 60.367, there is an express reference to its consistency with then-existing law concerning unlawful distributions.

To the extent that the section 546(e) exemption from avoidance of actual fraudulent transfers under section 548(a)(1)(A) could be interpreted as an acknowledgment that actual fraudulent transfers are considered settlement payments, that reasoning would not apply to a case where a court is presented with a transaction that is void and a nullity thereby resulting in no security obligation to discharge from which a settlement payment would flow nor any security transaction to complete.[9]

Further, the facts of the instant matter are distinguishable from those in the PHP case where a committee was trying to use state law to make and end-run around what had been determined to be a settlement payment. While potentially voidable, the settlement payment in PHP was valid until avoided and, as such, the court determined that the payment fell within the definition of settlement payment barred from avoidance by section 546(e) of the Bankruptcy Code. Here, because the transaction is void, there is no resulting settlement payment to protect from avoidance by section 546(e).

As previously noted, in order for the Court to determine whether the payment at issue is a settlement payment, the Court must first determine if the payment is an obligation under a securities agreement. As a matter of public policy, a bankruptcy court could not give legal significance to an agreement that is a nullity under state law. The *Adler* court applied policy considerations to support its decision that bogus transactions under federal securities laws were not settlement payments. *Adler*, 263 B.R. at 475. In *Grafton*, the court concluded that because section 546 was "designed to enhance enforcement of the securities laws and rules assuring the integrity of securities markets," payments that violated the securities laws were excluded from its protection. *Grafton*, 321 B.R. at 535, 538. The *Grafton* court reasoned that "the statutory protection of settlement payments presupposes that securities laws are not being offended." *Id.* at 538. Although the case before this Court does not involve a violation of federal securities laws, it involves a transaction that, if violative of controlling state law, would have no legal significance. The focal point of the *Adler* case and the *Grafton* case was whether the payment itself qualified as a settlement payment commonly used in the industry. The issue before this Court concerns whether or not there is a valid underlying securities transaction from which a settlement payment can flow. If there is no valid securities agreement under the controlling state law, there is no settlement payment to which to apply the protection of section 546 of the Bankruptcy Code.

While not addressing the issue of whether equitable relief could be afforded in instances involving a void transaction, the Court concludes that a void agreement cannot be recognized to impose an obligation under the *law* to make a settlement payment. An agreement that is void under controlling state law has no legal force or effect and carries no enforceable obligations. By comparison, voidable agreements, which seem to be focus of the section 546 exception, are "valid until annulled." Black's Law Dictionary (8th ed.2004). Thus, voidable agreements are legal, as a matter law, until the agreements are avoided. It is those types of transactions that a trustee

---

9. Moreover, even if only the settlement payment itself were void and a nullity, it could not be considered a payment "commonly used" in either the securities industry or the forward contract trade or, at a minimum, a factual hearing would be required to determine if a void payment was commonly used in the industry.

cannot attack under its statutory avoidance authority. This conclusion does not undermine Congressional intent. Indeed, independent of the Bankruptcy Code, as a matter of state law, no party in the guarantee chain has any obligations under void agreements.

 Alternatively, Bear Stearns argues that Enron's avoidance action was barred by section 546(g) of the Bankruptcy Code concerning swap agreements. Enron counters that its avoidance action is not barred by section 546(g) of the Bankruptcy Code for the same reasons that it argued its avoidance action was not barred under other subsections of section 546. Enron maintains that the legislative history makes clear that the sections concerning swap agreements were added to the Bankruptcy Code for the purpose of extending the same protections to swap agreements that were afforded to forward and securities transactions.

Section 546(g) provides

Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer under a swap agreement, made by or to a swap participant, in connection with a swap agreement and that is made before the commencement of the case, except under section 548(a)(2)(A) of this title.

11 U.S.C. § 546(g).

. The legislative history of section 546(g) indicates that the purpose of the section is to ensure that the swap financial market remains stabilized and protected from "uncertainties regarding the treatment of [its] financial instruments under the Bankruptcy Code." H.R. REP. No. 101–484, P.L. 101–311, *reprinted in,* 1990 U.S.C.C.A.N. 223, 1990 WL 92539 (May 14, 1990). This section was intended to extend to swap agreements the same type of protection from avoidance powers that was afforded to similar types of financial agreements, including forward, commodity and securities contracts. *Id.* Similar to the subsection concerning forward and securities contracts, section 546(g) provides, with respect to swap agreements, that a trustee may not avoid a transfer entered into prepetition except where the swap agreement is entered into with the actual intent to hinder, delay or defraud creditors. *Id.* at 223.

Where a transaction is rendered void by state law, it is a nullity. Thus, the purpose of subsection 546(g) is not implicated. The transaction is void and there is no recognized financial instrument to protect from the "uncertainties regarding [its treatment] under the Bankruptcy Code." Rather, the treatment of the financial instrument is the result of state law voiding the entire transaction. If it is determined that the transaction violated Oregon law, the agreement would be a nullity and have no legal effect. As a consequence, the transfer would not have been made under or in connection with a swap agreement and it would not be protected from avoidance under section 546(g) of the Bankruptcy Code.

The Court recognizes that, as a result of the minority view of Oregon state law regarding the legal consequences of a distribution while an entity is insolvent or rendered insolvent thereby, the conclusion reached here has narrow application. Indeed, it would only apply in the context of a violation of state law that rendered the underlying securities transaction void from which, as a consequence, no settlement payment could flow. Moreover, the purpose of section 546 of the Bankruptcy Code to protect the chain of guarantees is not implicated in this case because of its unique nature. This situation would only arise in the context of a company purchasing its own shares while insolvent or be-

cause of which it became insolvent and if that company were incorporated in a state that rendered such a transaction void.

## CONCLUSION

The Court concludes that if the payment to Bear Stearns is determined to be a violation of Or.Rev.Stat. § 60.181, the transaction by Enron to acquire its own shares was void under Oregon state law. If rendered void and a nullity, there was no securities transaction to complete and no settlement payment could result. Therefore, the payment could not be considered a settlement payment that qualifies for protection from avoidance under section 546(e) of the Bankruptcy Code.

Further, as a null and void transaction, Bear Stearns could not avail itself of the protection from avoidance provided for transfers in connection with swap agreements pursuant to section 546(g) of the Bankruptcy Code.

Accepting as true all of the material allegations in Enron's Complaint, section 546 of the Bankruptcy Code would not protect the transfer made in violation of Or.Rev.Stat. § 60.181 from avoidance. As Bear Stearns sought dismissal based upon the application of section 546 of the Bankruptcy Code, Bear Stearns's motion to dismiss the adversary proceeding is denied.

Counsel for the Debtors is to settle an order consistent with this Court's Memorandum Opinion.